# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CORINN BERKEN, CAROL CLARK,
CRIS-ANN CRAIG, KRYSTAL DIAL,
DEBRA FELKER, KELLI FOREMAN,
ASHLEY GILLIPSIE, PAMELA
HAVNEN, ANN MAGNUSON,
TREVOR MARBLE, BRUCE
POLLEKOFF, CHARLES FRANK
SCHULTZ, BRITTANI SHEPPARD,
DUSTIN STEWART, JAY WAGGONER,
ERICA WILLIS, and WISAM YACOUB,
on behalf of themselves and all others
similarly situated,

                Plaintiff,

    v.

FCA US LLC,

                Defendant.

Civil Action No.
_____

Hon.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................4

II.     JURISDICTION AND VENUE ..........................................16

III.    PARTIES .........................................................................17

      A.      Arizona Plaintiffs ...................................................17

      B.      Colorado Plaintiffs .................................................18

      C.      Georgia Plaintiffs ...................................................19

      D.      Iowa Plaintiffs ........................................................20

      E.      Louisiana Plaintiffs.................................................21

      F.      Maryland Plaintiffs.................................................21

      G.      Minnesota Plaintiffs ...............................................23

      H.      North Carolina Plaintiffs .......................................24

      I.      Oklahoma Plaintiffs................................................25

      J.      Texas Plaintiffs.......................................................26

      K.      Utah Plaintiffs.........................................................30

      L.      Wyoming Plaintiffs .................................................31

      M.      Defendant ................................................................33

IV.     FACTUAL ALLEGATIONS ...............................................34

      A.      Shift-by-Wire Transmission Systems ...................34

      B.      The Defective Shifter .............................................37

      C.      The Defective Shifter Does Not Adequately Alert Drivers to the Class Vehicles' Gear Position ...................40

      D.      FCA Touted Safety in Its Marketing and Advertising ......................44

      E.      FCA Knew About the Defective Shifter and Associated Safety Risks ...................50

            1.      NHTSA Complaints...................................51

      F.      FCA Stopped Installing the Defective Shifter in its Vehicles ...................65

i

G.  NHTSA Confirms a Design Defect in the Defective Shifter ............................................................66

H.  Despite NHTSA's Findings and FCA's Voluntary Recall, FCA Blames Drivers and Fails to Provide a Remedy within a Reasonable Time ....................................70

    1.  The Class Vehicles Are Recalled..............................71

    2.  FCA Failed to Provide a Remedy Within a Reasonable Time........................................................73

    3.  FCA Wrongly Blamed Drivers for Rollaway Incidents While it Delayed its Response ..................75

I.  FCA Finally Provides a Purported Remedy for Certain Class Vehicles: One that is Ineffective and Diminishes the Functionality of the Class Vehicles..............................80

    1.  FCA's Purported Remedy Is Ineffective ..................81

    2.  FCA's Purported Remedy Has Led to Other Mechanical Failures in Class Vehicles .....................83

    3.  FCA's Purported Remedy Diminishes the Functionality of the Class Vehicles ...........................92

    4.  Plaintiffs and Class Members Were Harmed by the Recall While Defendant Benefited ...........................93

J.  FCA's Delayed and Inadequate Response to the Defective Shifter Deprived Class Members of the Benefit of their Bargain and Has Led to a Decrease in Value of the Class Vehicles ..............................................................95

V.  TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL ......................................................................100

A.  Discovery Rule Tolling ......................................................100

B.  Estoppel .............................................................................101

VI.  CLASS ALLEGATIONS ..........................................................101

VII.  VIOLATIONS ALLEGED..........................................................107

A.  Claims Brought on Behalf of the Nationwide Class .........107

B.  Claims Brought on Behalf of the Arizona Subclass .........110

C.  Claims Brought on Behalf of the Colorado Subclass .......122

D.      Claims Brought on Behalf of the Georgia Subclass .........................133

E.      Claims Brought on Behalf of the Iowa Subclass .............................150

F.      Claims Brought on Behalf of the Louisiana Subclass......................162

G.      Claims Brought on Behalf of the Maryland Subclass.......................163

H.      Claims Brought on Behalf of the Minnesota Subclass ....................175

I.      Claims Brought on Behalf of the North Carolina Subclass .............193

J.      Claims Brought on Behalf of the Oklahoma Subclass.....................203

K.      Claims Brought on Behalf of the Texas Subclass............................216

L.      Claims Brought on Behalf of the Utah Subclass..............................229

M.      Claims Brought on Behalf of the Wyoming Subclass .....................241

VIII.  REQUEST FOR RELIEF...........................................................................253

IX.    DEMAND FOR JURY TRIAL ..................................................................255

The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel:[1]

## I.    INTRODUCTION

1.    Car makers must design and manufacture their cars to be safe to operate.  One of the most basic safety features in every car is the gear shifter that causes a stationary car to remain stationary unless and until the driver wants the car to move. The design of a gear shifter must be such that drivers know when a car is safe to exit because it is in the "Park" mode, and if a car maker decides to use a "monostable" shifter that does not change positions, it must include a safety override that automatically puts the car in Park or engages the parking brake when the driver gets out of the car.

2.    FCA US LLC ("FCA," "Company," or "Defendant") broke this basic rule when it designed and manufactured cars with monostable shifters that did not provide a reliable method of determining gear placement and did not include any safety-override to prevent rollaway accidents. From 2012-2015, FCA sold or leased hundreds of thousands of vehicles throughout the United States that

---

[1] Counsel's investigation includes an analysis of publicly available information, including consumer complaints, the investigation by the National Highway Transportation Safety Administration, information provided by Defendant relating to the recall of Class Vehicles, and additional analysis.  Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

contained a concealed and dangerous gearshift design defect that places drivers and occupants of the vehicles as well as the public at risk for serious injury or death, meaning that all purchasers and lessees of these vehicles paid more than the vehicle was actually worth.

3.      Plaintiffs Corinn Berken, Carol Clark, Cris-Ann Craig, Krystal Dial, Debra Felker, Kelli Foreman, Ashley Gillipsie, Pamela Havnen, Ann Magnuson, Trevor Marble, Bruce Pollekoff, Charles Frank Schultz, Brittani Sheppard, Dustin Stewart, Jay Waggoner, Erica Willis, and Wisam Yacoub ("Plaintiffs") bring this class action against FCA, individually and on behalf of all persons in the United States who purchased, leased or own a 2012-2014 Chrysler 300, 2012-2014 Dodge Charger, or 2014-2015 Jeep Grand Cherokee equipped with a monostable electronic gearshift supplied by ZF Friedrichshaffen AG (the "Class Vehicles"), for Defendant's fraud, negligent misrepresentation and concealment of the known gearshift defect in the Class Vehicles.

4.      FCA installed gear shifters in the Class Vehicles that departed from the long established "PRND" gear selector that provided a distinct position of the shifter for each gear.  Unlike traditional automatic transmission shifters, the Class Vehicles are equipped with a monostable electronic gearshift supplied by ZF Friedrichshaffen AG ("ZF"), which returns to a central predetermined position after a driver switches gears (the "Defective Shifter").  The Defective Shifter does

not move into a physical gear position like a traditional shifter but rather springs back to its original position after a driver selects a gear.  Thus, the only indication that a specific gear has been selected is that a light changes, *i.e.*, when shifting from Drive to Park, the light changes from D to P.  There is no physical Park, Reverse, Neutral or Drive gear level, and there is no safety override function that puts the Class Vehicles into Park if a driver attempts to exit the vehicle while it is in another gear.

5.     The design of the Defective Shifter is dangerously defective because of the lack of a physical gear position that would clearly notify drivers regarding which gear their vehicle is in, *and* the lack of a safety override function that would automatically put the vehicle in Park or engage a parking brake when a driver attempts to exit the vehicle when it is not in Park.  This dangerous defect has resulted in hundreds of accidents and vehicle rollaways as a result of drivers not knowing which gear their transmission is in and/or exiting their vehicle without the vehicle in Park.

6.     The safety issue is real.  As of February 2016, the National Highway Transportation Safety Administration ("NHTSA") and the Office of Defects Investigation ("ODI") (collectively, "NHTSA-ODI") had identified over 300 incidents of vehicle rollaway and/or accidents following intended shifts to Park due to the Defective Shifter, including 121 incidents that resulted in crashes and 30 that

involved injuries.[2]   Injuries included fractured pelvises, a ruptured bladder, a fractured kneecap, broken ribs, broken noses, facial lacerations requiring stitches, sprained knees, severe bruising and trauma to legs.[3]   There were 325 additional complaints regarding Class Vehicle drivers' difficulty shifting into Park.[4]

7.      As a result of the consumer complaints, NHTSA-ODI investigated the Defective Shifter and described the defect as follows: "***Drivers may exit the vehicle when the engine is running and the transmission is not in Park, resulting in unattended vehicle rollaway.   Rollaway incidents may result in serious injuries to the driver or passengers as they exit the vehicle or to other pedestrians in the path of the rolling vehicle***."[5]

8.      NHTSA-ODI's testing indicated that operation of the Defective Shifter "is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection."[6]   NHTSA-ODI also found that the functions related to the Defective Shifter in Class Vehicles "***[do] not***

---

[2] *See* Exhibit A ("NHTSA-ODI Resume 1", reporting the results of an investigation launched in August 2015 and announcing the opening of an Engineering Analysis).

[3] *See id.*

[4] *See id.*

[5] *See id*. (emphasis added).

[6] *See id.* (emphasis added).

***protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off***."[7]

9.     NHTSA also concluded that the Defective Shifter "***appears to violate several basic design guidelines for vehicle controls***, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[8]

10.     Although FCA has known of the Defective Shifter and associated safety risks since shortly after certain of the Class Vehicles were placed on the market in 2011, it has failed to act within a reasonable time to notify Plaintiffs and members of the Classes (defined below) of the defect and/or provide a remedy to protect them from the associated safety risks.  Rather, FCA waited until April 22, 2016 to issue a recall for certain of the Class Vehicles and took months after the recall to offer the Company's purported remedy for its defective design of the Defective Shifter.[9]   Additionally, the recall and purported remedy do not fully compensate Plaintiffs and members of the Classes for either the decrease in value

---

[7] *See id.* (emphasis added).

[8] *See* Exhibit B ("NHTSA-ODI Resume 2" announcing the findings of the Engineering Analysis announced in NHTSA-ODI Resume 1) (emphasis added).

[9] *See* Exhibit C, Press Release, *Statement: Shift Strategy*, FCA North America, Apr. 22, 2016, http://media.fcanorthamerica.com/newsrelease.do?id=17455&mid= (last visited Dec. 16, 2016) ("Recall Press Release").

of their vehicle since the defect came to light or for their time dedicated to fixing the defect.

11.     On or around May 14, 2016, FCA sent owners and lessees of the Class Vehicles a notification letter informing them about the Defective Shifter and associated safety risks, but offered no remedy or repair.[10]   Rather, FCA told consumers that "a permanent remedy for this condition is currently under development" and it "is working to finalize a remedy by the 4th quarter of 2016."[11] Thus, as of May 2016, FCA left owners and lessees of Class Vehicles with two undesirable options: (1) have no transportation while FCA implements a remedy; or (2) drive a dangerously defective vehicle that puts drivers, occupants and the public at risk for injury or death.

12.     FCA has long known of the safety risks associated with the defect in the Defective Shifter.  In FCA's own recall chronology it states that as of April 12, 2016, "FCA has identified approximately 700 field reports potentially related to this issue which includes 212 crashes, 308 claims of property damage and 41 injuries."[12]

---

[10] *See* Exhibit D ("May 2016 FCA Recall Letter").

[11] *See id.*

[12] *See* FCA US LLC Chronology, Monostable Gear Selector (Submitted on April 22, 2016), available at http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/ doc/UCM514516/RMISC-16V240-7112.pdf (last visited Dec. 16, 2016) ("FCA Chronology"), Exhibit E.

13.    Moreover, FCA recognized that the Class Vehicles contained a defect and stopped installing the Defective Shifter in certain 2015 and 2016 vehicles. As noted on its website: "To address customer-satisfaction issues, the Company began equipping the Charger and 300 with a new shift-lever design in model-year 2015. The Grand Cherokee's shift-lever was updated in model year 2016."[13]

14.    In fact, the design defect was avoidable.  For example, FCA competitors, including BMW, have for several years used similar monostable electronic shift levers that return to center after being engaged.  But on the BMW, if the car is not in "Park," and the driver's door is opened and the foot brake released, the car automatically shifts into "Park."  Likewise, the Audi A8 luxury sedan uses the same Defective Shifter that FCA used in the Class Vehicles.  But Audi did not sell a single A8 equipped with the Defective Shifter until it had developed a safety override that automatically engaged the electronic parking brake on the car if the driver's door is opened while the seatbelt is unbuckled.

15.    It is indisputable that from the time FCA first sold a Class Vehicle, it had the ability and technological capability to install a safety override that would have prevented the rollaway incidents that have plagued the Class Vehicles and caused hundreds of accidents, dozens of injuries, and at least one death.  It simply chose not to do so.

---

[13] *See* Exhibit C (Recall Press Release).

16.    On May 24, 2016, NHTSA submitted a safety recall report explaining

FCA's acknowledgement of the defect as follows:

> Drivers    erroneously    concluding    that    their    vehicle's
> transmission is in the PARK position may be struck by the
> vehicle and injured if they attempt to get out of the vehicle
> while the engine is running and the parking brake is not
> engaged. ***FCA US has therefore determined that the absence
> of an additional mechanism to mitigate the effects of driver
> error in failing to shift the monostable gear selector into
> PARK prior to exiting the vehicle constitutes a defect
> presenting a risk to motor vehicle safety***.[14]

17.    On June 20, 2016, the public became aware of the significant safety

risks associated with the Defective Shifter when it was reported that a young

Hollywood actor, Anton Yelchin, was crushed to death when his 2015 Jeep Grand

Cherokee rolled backward down his driveway and pinned him against his mailbox

after he exited the vehicle.

18.    On June 21, 2016, NHTSA submitted an updated safety recall report

explaining that FCA is recalling over 800,000 vehicles in the United States

equipped with the Defective Shifter in order to remedy its design defect.[15]

19.    On June 24, 2016, FCA issued a follow-up recall notice to owners and

lessees of certain models of Jeep Grand Cherokees.[16]   According to FCA, the

Company's purported remedy would involve taking the vehicle to an FCA dealer,

---

[14] *See* Exhibit F ("NHTSA Safety Recall Report 1") (emphasis added).

[15] *See* Exhibit G ("NHTSA Safety Recall Report 2").

[16] *See* Exhibit H ("June 2016 FCA Second Recall Notice").

who would "install new software to include an 'Auto Park' feature which eliminates the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle."[17]  The letter also stated that the dealer would provide additional information and guidance regarding the new feature, stating:

> You will receive an "Auto Park" addendum card explaining the vehicle's new "Auto Park" feature.  After your vehicle receives the software update, please review the addendum card with all of the drivers of your vehicle and then store the addendum card in the owner's manual for future reference. Your dealer will also review/demonstrate this new "Auto Park" feature and answer any questions or concerns.[18]

20.    To date, FCA's purported remedy has been ineffective, has led to additional rollaway incidents and other mechanical failures in the Class Vehicles, and has diminished the functionality of the Class Vehicles.  Numerous complaints have been made to NHTSA describing incidents where Class Vehicles have experienced rollaway incidents after the software update was performed on the vehicles, and incidents where the software update led to other mechanical failures in the vehicles.[19]

21.    On information and belief, dealerships have reported that the first recall remedy was ineffective, many of the Class Vehicles have had to be fixed

---

[17] *See id.*

[18] *Id.*

[19] *See infra*, Section IV. I.

more than once, and even FCA's own dealers are unsure whether the second recall remedy will effectively fix the Defective Shifter, thus requiring Plaintiffs and members of the Classes to devote even more time to remedying this defect.

22.     FCA already has admitted that at least 13,000 Class Vehicles in the United States have not been properly fixed even though they were recalled and repaired by the Company.  According to a November 16, 2016 *Associated Press* article: "The new software was supposed to make the cars and SUVs automatically shift into park when the driver's door is opened while the engine is running.  But Fiat Chrysler says the change didn't properly fix 13,000 vehicles in the U.S. and 16,000 in other countries."[20]   In addition, FCA sent certain Class members a second recall notice, informing them of the need to take their Class Vehicle to the dealership for additional repairs.[21]

23.     Plaintiffs and members of the Classes were harmed by the Defective Shifter and recall in a number of ways, in that they, *inter alia*: (1) did not receive the benefit of the bargain of the purchase or lease of the Class Vehicles which were sold and leased as safe and reliable vehicles at premium prices even though they contained a known but concealed defect; (2) were forced to take time off from

---

[20] *See* Exhibit I, Tom Krishner, *New software doesn't fix Fiat Chrysler gearshifts*, The Columbus Dispatch (Nov. 16, 2016), http://www.dispatch.com/content/ stories/business/2016/11/16/software-fix-fiat-chrysler_.html#   ("November 2016 Associated Press Article").

[21] *See* Exhibit J ("Notice of Need For Additional Repairs").

work and/or their daily activities in order to have the repair implemented (in some cases more than once); (3) own or lease a repaired vehicle which suffers from continued rollaways or other mechanical failures; (4) own or lease a repaired vehicle with diminished functionality due to the remedy instituted by FCA; and/or (5) own a vehicle that has substantially diminished in value and is diminishing in value at an increased rate each month and thus cannot be sold without incurring substantial losses.

24.     As a specific example of the increased diminution in value, 2014 and 2015 Jeep Grand Cherokees held their value *better* than other cars in their class before knowledge of the shifter defect became widespread, but after the defect became known, the monthly depreciation of these cars increased drastically, causing them to hold value *worse* than other cars in their class.

25.     While Plaintiffs and Class members were harmed by the recall, FCA benefited from and has been unjustly enriched by the recall which has forced hundreds of thousands of Class members to visit FCA dealerships nationwide in order to have their Class Vehicles repaired—without the need for FCA to spend millions in advertising and marketing to drive customers to its dealerships.

26.     Defendant misrepresented the standard, quality or grade of the Class Vehicles and knowingly, actively, and affirmatively omitted and/or concealed the existence of the Defective Shifter to increase profits by selling additional Class

Vehicles.    Knowledge  and  information  regarding  the  Defective  Shifter  and associated safety risks were in the exclusive and superior possession of Defendant and its dealers, and was not provided to Plaintiffs and members of the Classes, who could  not  reasonably  discover  the  defect  through  due  diligence.    Based on pre-production  testing,  design  failure  mode  analysis,  and  consumer  complaints  to dealers and NHTSA, *inter alia*, Defendant was aware of the design defect in the Defective  Shifter  and  fraudulently  concealed  the  defect  from  Plaintiffs  and members of the Classes.

27.    Plaintiffs and members of the Classes (defined below) assert claims against  Defendant  for  fraud,  negligent  misrepresentation,  violation  of  The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., unjust enrichment, breach of express and implied contractual duties, breach of express and implied warranties, and violations of state consumer protection laws.

28.    As a direct result of FCA's wrongful conduct, Plaintiffs and members of the Classes have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.    Specifically, Plaintiffs seek: immediate installation of an effective safety override system that does not diminish the functionality of the Class Vehicles or replacement of the Defective  Shifter

15

altogether; provision of a temporary replacement vehicle while repair of the defect is pending, and/or buyback of the Class Vehicles; compensation for any additional sums spent on any repairs to the Defective Shifter and/or any "fix" performed on the Class Vehicles; restitution for purchase of extended warranties that will go unused; compensation for the increased loss in value and depreciation of the Class Vehicles due to widespread knowledge of the shifter defect, and punitive damages for FCA's knowing fraud that put drivers and members of the public nationwide at risk.

## II.   JURISDICTION AND VENUE

29.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendant, and greater than two-thirds of the members of the Classes reside in states other than the state in which Defendant is a citizen.  This Court has jurisdiction over supplemental state law claims pursuant to 20 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

30.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendant maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendant conducts a substantial amount of business in this District.   Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in the District and venue is proper.

## III.   PARTIES

### A.     Arizona Plaintiffs

**<u>Plaintiff Wisam Yacoub</u>**

31.     Plaintiff Wisam Yacoub is a resident of Arizona domiciled in San Tan Valley, Arizona.  Plaintiff Yacoub owns a 2014 Chrysler 300, which he purchased new from Bill Luke Chrysler Jeep Dodge Ram in Phoenix, Arizona.  He purchased the car because of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability.  Plaintiff Yacoub believed his Chrysler 300 would be a good value because of its utility and reputation for safety.  Plaintiff Yacoub still owns his Chrysler 300.

32.     Unbeknownst to Plaintiff Yacoub at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters

17

sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Yacoub of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the Defective Shifter, Plaintiff Yacoub experienced an incident in which his Chrysler 300 should have been in park, but instead rolled back and hit his son.

### B.     Colorado Plaintiffs

**Plaintiff Debra Felker**

33.     Plaintiff Debra Felker is a resident of Colorado domiciled in Grand Junction, Colorado. On November 17, 2015, Plaintiff Felker purchased a new 2015 Jeep Grand Cherokee at Grand Junction Chrysler Dodge Jeep Ram in Grand Junction, Colorado. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Felker believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

34.     Unbeknownst to Plaintiff Felker at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Felker of the Defective Shifter and corresponding safety risk associated with her vehicle.

Given the Defective Shifter, Plaintiff Felker experienced five separate rollaway incidents in her Jeep Grand Cherokee.  Two of these rollaway incidents occurred after previously having had the recall work performed. Because Plaintiff Felker no longer felt safe driving the vehicle, Plaintiff Felker had no choice but to trade it in. Plaintiff Felker suffered a significant financial loss when she traded in the vehicle but Plaintiff Felker knew that the vehicle was too unsafe to continue driving.

### C.      Georgia Plaintiffs

**Plaintiff Erica Willis**

35.      Plaintiff Erica Willis is a resident of Georgia domiciled in Atlanta, Georgia.  Plaintiff Willis bought a used 2012 Dodge Charger at a Ford Dealership in Conyers, Georgia.  She purchased the car because of its reputation for safety and utility, consistent with her exposure to Chrysler's advertising messaging.  Plaintiff Willis believed her Dodge Charger would be a good value because of its utility and reputation for safety.  Plaintiff Willis still owns her Dodge Charger.

36.      Unbeknownst to Plaintiff Willis at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Willis of the Defective Shifter and corresponding safety risk associated with her vehicle.

### D.   Iowa Plaintiffs

**Plaintiff Pamela Havnen**

37.    Plaintiff Pamela Havnen is a resident of Iowa domiciled in Ankeny, Iowa.  Plaintiff Havnen bought a new 2015 Jeep Grand Cherokee at Duey Ford in Iowa.   She purchased the car because of its reputation for safety and utility, consistent with her exposure to Jeep's advertising messaging.  Plaintiff Havnen believed her Jeep Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Havnen still owns her Jeep Grand Cherokee.

38.    Unbeknownst to Plaintiff Havnen at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Havnen of the Defective Shifter and corresponding safety risk associated with her vehicle.  Given the Defective Shifter, Plaintiff Havnen has experienced rollaway incidents in her Jeep Grand Cherokee.  Although Defendant provided a repair through the recall, Plaintiff Havnen still experiences an unusual shift aspect in her Jeep Grand Cherokee, and is constantly double-checking the position of the gearshift.

### E.   Louisiana Plaintiffs

**Plaintiff Dustin Stewart**

39.    Plaintiff Dustin Stewart is a resident of Louisiana domiciled in Walker, Louisiana.  On May 13, 2015, Plaintiff bought a used 2014 Jeep Grand Cherokee at Brian Harris Jeep (now Salisbury's Chrysler Dodge Jeep Ram) in Baton Rouge, Louisiana.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Stewart believed his Grand Cherokee would be a good value because of its utility and reputation for safety.

40.    Unbeknownst to Plaintiff Stewart at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Stewart of the Defective Shifter and corresponding safety risk associated with his vehicle.  Given the defect, Plaintiff's vehicle has rolled away on at least two occasions and Plaintiff no longer feels safe driving the vehicle.

### F.   Maryland Plaintiffs

**Plaintiff Bruce Pollekoff**

41.    Plaintiff Bruce Pollekoff is a resident of Maryland domiciled in Potomac, Maryland.  Plaintiff Pollekoff bought a new 2015 Jeep Grand Cherokee

21

at Koons Tyson Chrysler Dodge Jeep RAM in Vienna, Virginia.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Pollekoff believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Pollekoff still owns his Jeep Grand Cherokee.

42.     Unbeknownst to Plaintiff Pollekoff at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Pollekoff of the Defective Shifter and corresponding safety risk associated with his vehicle.  Given the defects, Plaintiff Pollekoff's vehicle has rolled away on at least three occasions in Maryland before having the recall work performed.  After having the recall work done, Plaintiff Pollekoff experienced one more roll away incident in Maryland.  Plaintiff no longer feels safe driving the vehicle.  Plaintiff Pollekoff's wife and son refuse to drive the vehicle because they believe the vehicle is too unsafe.

**Plaintiff Charles Frank Schultz**

43.     Plaintiff Charles Frank Schultz is a resident of Maryland domiciled in Linthicum, Maryland.  On September 29, 2015, he bought a used 2014 Jeep Grand

Cherokee at Don White's Timonium Chrysler Dodge Jeep RAM in Cockeysville, Maryland. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Schultz believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff Schultz still owns his Jeep Grand Cherokee.

44.     Unbeknownst to Plaintiff Schultz at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Schultz of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Schultz's vehicle has rolled away on at least one occasion. Plaintiff Schultz no longer feels safe driving the vehicle.

### G.     Minnesota Plaintiffs

**Plaintiff Corinn Berken**

45.     Plaintiff Corinn Berken is a resident of and is domiciled in Eagan, Minnesota. Plaintiff Berken purchased a used 2014 Jeep Grand Cherokee from Delacy Automotive in Minnesota. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging

regarding safety and reliability. Plaintiff Berken believed her Jeep Grand Cherokee would be a good value because of its utility and reputation for safety.

46. Unbeknownst to Plaintiff Berken at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Berken of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Berken has experienced a rollaway incident with her Jeep which resulted in property damage.

## H. North Carolina Plaintiffs

### Plaintiff Brittani Sheppard

47. Plaintiff Brittani Sheppard is a resident of the state of North Carolina, domiciled in Mooresville, North Carolina. She owns a 2015 Jeep Grand Cherokee, which she purchased from Lake Norman Chrysler Dodge Jeep Ram in Huntersville, North Carolina.

48. Unbeknownst to Plaintiff Sheppard at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and

subsequent recall letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Sheppard of the Defective Shifter and corresponding safety risk associated with her vehicle.

      **I.**     **Oklahoma Plaintiffs**

**Plaintiff Carol Clark**

     49.    Plaintiff Carol Clark is a resident of Oklahoma, domiciled in Chocktaw, Oklahoma. On September 13, 2014, Plaintiff Clark bought a new 2014 Jeep Grand Cherokee at David Stanley Chrysler Dodge Jeep Ram in Midwest City, Oklahoma. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Clark believed her Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff Clark still owns her Jeep Grand Cherokee.

     50.    Unbeknownst to Plaintiff Clark at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent recall letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Clark of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Clark's vehicle has rolled away on at least one

occasion due to the defect and Plaintiff Clark no longer feels safe driving the vehicle.

### J.    Texas Plaintiffs

**Plaintiff Cris-Ann Craig**

51.    Plaintiff Cris-Ann Craig is a resident of Texas domiciled in Johnson City, Texas.  Plaintiff Craig bought a 2014 Jeep Grand Cherokee at Bluebonnet Dodge Jeep in New Braunfels, Texas.  She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Craig believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

52.    Unbeknownst to Plaintiff Craig at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Craig of the Defective Shifter and corresponding safety risk associated with her vehicle. Plaintiff Craig still owns her Jeep Grand Cherokee.

**Plaintiff Kelli Foreman**

53.    Plaintiff Kelli Foreman is a resident of Texas domiciled in Humble, Texas.  Plaintiff Foreman bought a new 2014 Jeep Grand Cherokee at Texan Chrysler Jeep Dodge Ram in Humble, Texas.  She purchased the car because of its

reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Foreman believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

54.     Unbeknownst to Plaintiff Foreman at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Foreman of the Defective Shifter and corresponding safety risk associated with her vehicle.  Given the defect, Plaintiff Foreman experienced a situation in which her vehicle did not properly shift into gear, and rolled away from her.   Plaintiff Foreman still owns her Jeep Grand Cherokee.

**Plaintiff Krystal Dial**

55.     Plaintiff Krystal Dial is a resident of Texas domiciled in Tyler, Texas. Plaintiff Dial bought a new 2014 Jeep Grand Cherokee at Randall Noe Chrysler Dodge Jeep Ram in Terrell, Texas.  She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Dial believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

56.     Unbeknownst to Plaintiff Dial at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Dial of the Defective Shifter and corresponding safety risk associated with her vehicle. Plaintiff Dial still owns her Jeep Grand Cherokee.

**Plaintiff Ashley Gillipsie**

57.     Plaintiff Ashley Gillipsie is a resident of Texas domiciled in Omaha, Texas.  Plaintiff Gillipsie bought a new 2015 Jeep Grand Cherokee at Dow Jeep Chrysler in Pittsburgh, Texas.  She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Gillipsie believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

58.     Unbeknownst to Plaintiff Gillipsie at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Gillipsie of the Defective Shifter and corresponding safety risk associated with her

vehicle.  Given the defect, Plaintiff Gillipsie experienced an incident in which her Jeep was parked outside of her parents' house and her father saw the Jeep begin to roll away.  Plaintiff Gillipsie still owns her Jeep Grand Cherokee.

**Plaintiff Jay Waggoner**

59.   Plaintiff Jay Waggoner is a resident of Texas domiciled in Portland, Texas.  Plaintiff Waggoner bought a 2014 Chrysler 300 from Allen Samuels Chrysler-Dodge in Aranas Pass, Texas.  He purchased the car because of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability.  Plaintiff Waggoner believed his Chrysler 300 would be a good value because of its utility and reputation for safety.

60.   Unbeknownst to Plaintiff Waggoner at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.   Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Waggoner of the Defective Shifter and corresponding safety risk associated with his vehicle.  Given the defect, Plaintiff Waggoner experienced rollaway incidents with his Chrysler, both before and after Defendant performed

the purported repair on Plaintiff Waggoner's vehicle.  Plaintiff Waggoner still owns his Chrysler.

### K.    Utah Plaintiffs

**Plaintiff Trevor Marble**

61.    Plaintiff Trevor Marble is a resident of Utah domiciled in Salt Lake City, Utah.  On January 7, 2014, Plaintiff purchased a used 2014 Jeep Grand Cherokee at Layton Hills Chrysler Dodge Jeep Ram in Layton, Utah.   He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Marble believed his Jeep would be a good value because of its utility and reputation for safety.  Plaintiff Marble still owns his Jeep Grand Cherokee.

62.    Unbeknownst to Plaintiff Marble at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Marble of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Marble's vehicle has rolled away on one occasion.

## L.      Wyoming Plaintiffs

**Plaintiff Ann Magnuson**

63.      Plaintiff Ann Magnuson is a resident of Wyoming domiciled in Wilson, Wyoming.  In or around June 3, 2015, she bought a new 2015 Jeep Grand Cherokee at Castle Rock Jackson in Jackson, Wyoming.  She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Magnuson believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

64.      Unbeknownst to Plaintiff Magnuson at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.   Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Magnuson of the Defective Shifter and corresponding safety risk associated with her vehicle.  Given the defect, Plaintiff Magnuson's vehicle has rolled away on one occasion and Plaintiff no longer feels safe driving the vehicle. During the roll away, Plaintiff Magnusson had to jump, tuck and roll out of the vehicle as the vehicle careened into the street. While she was able to avoid injury, there was substantial damage to her vehicle.

65.     None of the advertisements reviewed or representations received by Plaintiffs and members of the Classes contained any disclosure relating to the Defective Shifter and associated safety risk.  Had Defendant disclosed that the Class Vehicles contained a Defective Shifter and corresponding safety risk, Plaintiffs and members of the Classes would have not purchased or leased their vehicles, or would have paid less for their vehicles.

66.     When Plaintiffs and members of the Classes purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be equipped with a gear shifting system that was free from defects and safe to operate.  Had Defendant disclosed that the Defective Shifter in the Class Vehicles could lead to dangerous rollaway incidents, Plaintiffs and members of the Classes would have not purchased or leased their vehicles, or would have paid substantially less for their vehicles.

67.     The Class Vehicles were operated in a reasonably foreseeable manner and as the vehicles were intended to be used.  Plaintiffs and members of the Classes have suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Defective Shifter and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of their respective vehicles.

68.     Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiffs and members of the Classes of the Defective Shifter and associated safety risk prior to the purchase or lease of the Class Vehicles.

## M.     Defendant

69.     Defendant FCA is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan. FCA is a member of the Fiat Chrysler Automobiles N.V. ("Fiat Chrysler") family of companies. Fiat Chrysler is a Dutch corporation with its headquarters in London, England. As of 2015, FCA is the seventh largest automaker in the world by unit production.

70.     FCA designs, engineers, manufactures and sells vehicles under the Chrysler, Jeep, Dodge, Ram, and Fiat brands in this District and throughout the United States. FCA manufactures, distributes, and sells motor vehicles and parts through its network of authorized motor vehicle dealers. FCA engages in interstate commerce by selling vehicles through its authorized dealers located in every state of the United States, including within this District.

71.     At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles throughout the United States. Defendant and/or its agents designed, manufactured,

and/or installed the Defective Shifter in the Class Vehicles.  Defendant and/or its agents also developed and disseminated the owner's manuals and warranty booklets, advertisements and other promotional materials relating to the Class Vehicles.

## IV.    FACTUAL ALLEGATIONS

### A.    Shift-by-Wire Transmission Systems

72.    Shift-by-wire transmission systems, like the one installed in the Class Vehicles, manipulate gear changes without the use of a mechanical linkage between the gear shifting lever and the transmission; thus, saving materials and manufacturing costs, and saving valuable design space in the center console area where the mechanical link to the transmission would be installed.

73.    Shift-by-wire transmissions use electronic signals and electronic control modules to manipulate transmission gear changes.  Drivers engage control mechanisms such as levers and/or buttons that send electronic signals to manipulate the electronic control module, which shifts the transmission into the desired gear.  Control mechanisms currently in use include: (1) a monostable electronic gear shift ("Monostable Shifter"); (2) a rotary electronic gear shift ("Rotary Shifter"); or (3) a polystable electronic gear shift ("Polystable Shifter").

74.    Monostable Shifters are characterized as "monostable" because their shifter levers always return to a single predetermined location after the desired gear

is selected.  Drivers push or pull a Monostable Shifter lever backward or forward one or more times and release the lever at their desired gear.  The shift-by-wire system then relies on electronic signals and an electronic control module to shift the transmission into the selected gear.  Monostable Shifter levers do not physically move and rest in separate physical positions, or "detents," for Park, Reverse, Neutral and Drive ("PRND") in order to change transmission gears.

75.    Below is an image of Monostable Shifter in a 2015 Jeep Grand Cherokee, a Class Vehicle:



76.    Some shift-by-wire transmissions do not even use a shift lever.  For example, the Rotary Shifter uses a rotary wheel to cycle through PRND and then sends the electronic signal that corresponds with the selected gear.[22]

---

[22] As discussed herein, on December 20, 2016, it was reported that NHTSA was launching an investigation into FCA's Rotary Shifters installed in 2013-16 Dodge Ram pickup trucks and 2014-16 Dodge Durango SUVs.  The investigation follows

77.    A Polystable Shifter incorporates the shift-by-wire electronic gear changes and the tactile feedback of a traditional mechanical gear shifter.  The Polystable Shifter mimics the tactile feedback of a traditional mechanical gear shifter because it requires drivers to push or pull the shifter into predetermined physical slots for P, R, N or D.  The benefit of a Polystable Shifter is that drivers receive the familiar tactile feedback associated with traditional mechanical gear shifters, thereby eliminating instances in which a driver thinks the vehicle is in P when it is actually in R, N or D.

78.    Below is an image of Polystable Shifter that FCA began using in 2016 Jeep Grand Cherokees:

reports that certain of the vehicles rolled away after having been placed in Park. *See* Exhibit K, David Shepardson, *U.S. probes 1 million Fiat Chrysler vehicles for roll-away crashes*, Reuters (Dec. 20, 2016), http://www.reuters.com/article/us-usa-fiat-chrysler-idUSKBN149171 ("December 2016 Reuters Article").



79.    As the above image demonstrates, the Polystable Shifter slides back and forth and rests in predetermined physical slots for P, R, N or D.

**B.    The Defective Shifter**

80.    The Class Vehicles are equipped with the Defective Shifter, which was manufactured and supplied by ZF.  Unlike a traditional gear shifter, and unlike a polystable electronic shifter, the Defective Shifter in the Class Vehicles does not have individual physical positions into which the gear shifter lever moves and rests for PRND.  The Defective Shifter requires drivers to cycle through PRND by pressing a button on the shifter-lever knob and either pushing the shifter lever forward or pulling backward to cycle through PRND.  After drivers push or pull

37

the shifter lever to select their desired gear, the shifter lever returns to its predetermined central location.

81.    Once drivers have selected their desired gear, the Defective Shifter uses illuminated PRND letters on the shifter-lever knob and illuminated PRND letters on the driver's informational display to indicate whether the vehicle is in Park, Reverse, Neutral or Drive.  Thus, there is no physical gear level associated with Park, Reverse, Neutral or Drive as there is in a traditional automatic transmission shifter.

82.    Among other things, the lack of a physical gear level for PRND and the Defective Shifter's return to its predetermined location has led to hundreds of reports of Class Vehicles rolling away when drivers thought their vehicles were in Park.

83.    FCA has recognized that its Defective Shifter does not adequately convey gear position to drivers of Class Vehicles, stating: "[g]ear-selection is conveyed to the driver by multiple sets of indicator lights, not gear-selector position, and unless due care is taken, drivers may draw erroneous conclusions about the status of their vehicles."[23]

84.    Unlike other automobile manufacturers, FCA did not implement a safety override feature that would prevent Class Vehicles from moving when the

---

[23] *See* Exhibit C (Recall Press Release).

vehicles are not in Park and a driver opens the driver door and disengages pressure on the gas or brake pedals to exit the vehicle.

85.    Unlike the Defective Shifter, traditional automatic gear shifter systems such as those found in most vehicles have grooves and separate physical resting places for PRND into which drivers can cause the shifter lever to rest.  This type of gear shifting system gives drivers a visual cue as to the current gear the vehicle is in because the shifter lever physically rests on Park, Reverse, Neutral or Drive.   Additionally, such systems use tactile feedback to alert drivers to the vehicle's gear position because they require drivers to cause the shifter lever to rest on the desired gear position by either physically pushing or pulling the shifter lever to that position.  Thus, traditional gear shifting systems provide more information to the driver by using both tactile and visual cues to inform drivers of their vehicle's gear position.

86.    Below is an image of a traditional mechanical gear shift design from a 2010 Chevrolet Aveo:



**C.    The Defective Shifter Does Not Adequately Alert Drivers to the Class Vehicles' Gear Position**

87.    The Defective Shifter's use of solely visual cues to alert drivers to the Class Vehicles' gear position is ineffective because drivers may not realize that they have not pushed the gear lever forward or backward enough to engage their desired gear.   The Defective Shifter's use of solely visual cues (without tactile feedback) to alert drivers to the Class Vehicles' gear position is especially problematic when drivers leave their car while the engine is running.   Because there is no tactile feedback informing a driver whether the shifter lever has physically moved and is resting in P, R, N or D, drivers may think have pushed the

shifter lever forward enough to engage the Park gear and may exit the vehicle when it is not actually in Park.

88.     The Defective Shifter's sole reliance on visual feedback to convey gear selection has been dangerously ineffective.  Indeed, consumer complaints beginning at least as early as 2013 reproduced verbatim below document Class Vehicle owners' and lessees' inability to determine whether their vehicle is in the desired gear resulting in hundreds of rollaways, accidents and injuries.  Further, numerous complaints to NHTSA allege that once a driver puts a Class Vehicle into Park, the vehicle can move into another gear on its own.

89.     In addition to the defective design of the Defective Shifter, FCA has failed to implement any safety override or fail-safe features that would cause the Class Vehicles to automatically shift into Park or engage the parking brake when the engine is running and the driver-side door is open and the driver is exiting the vehicle.  The lack of a fail-safe feature is especially problematic because the engine stop button in the Class Vehicles is programmed to not function when drivers attempt to shut off the engine while the vehicle is not in Park.  Class Vehicles are also programmed to shift into Neutral gear by default if drivers attempt to shift into Park while the vehicle is moving faster than 1.2 mph.

90.     Safety override features are common in other car companies' vehicles that use a Monostable Shifter and, if FCA had employed a safety override, it may

41

have prevented the collisions, injuries and death associated with the Defective Shifter.   For example, Mercedes-Benz USA, LLC ("Mercedes-Benz") sells vehicles with Monostable Shifters like those in the Class Vehicles; but, Mercedes-Benz vehicles include a safety feature that automatically shifts the gear to Park when the engine is running and the driver releases his foot off of the brake pedal and the driver-side door is opened.   This safety override eliminates the potential for the dangerous vehicle rollaways associated with the Defective Shifter.   Such a fail-safe feature likely could have prevented the approximately "212 crashes, 308 claims of property damage and 41 injuries" FCA identified from "700 field reports" related to the Defective Shifter.[24]

91.     NHTSA has reported that the Defective Shifter "*appears to violate several basic design guidelines for vehicle controls*, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[25]

92.     No reasonable consumer expects to purchase a vehicle with a Defective Shifter and associated safety risk that could expose her/him to collisions, vehicle rollaways and potential injury and death.   Further, Plaintiffs and members

---

[24] Exhibit E (FCA Chronology).

[25] Exhibit B (NHTSA-ODI Resume 2).

of the Classes do not reasonably expect Defendant to omit or conceal a defect in the Class Vehicles or omit or conceal a known safety risk that puts drivers, passengers and the public at risk.  Plaintiffs and members of the Classes had no reasonable way to know that Class Vehicles contained Defective Shifters which were defective in materials, workmanship, design and/or manufacture and posed a significant safety risk.

93.    As alleged herein, Plaintiffs and members of the Classes unknowingly purchased or leased vehicles that "violate several basic design guidelines" and suffered diminished market value and other damages related to their purchase or lease of the Class Vehicles as a direct result of Defendant's material misrepresentations and omissions regarding the standard, quality or grade of the Class Vehicles and/or the existence of the Defective Shifter and safety risk.  The fact that the Class Vehicles contain the Defective Shifter is material to Plaintiffs and members of the Classes because it diminishes the value of the Class Vehicles and presents a risk of injury and/or death to drivers and passengers of the Class Vehicles.

94.    As a result of Defendant's material misrepresentations and omissions, including its failure to disclose that the Class Vehicles incorporate the Defective Shifter, Defendant has caused Plaintiffs and members of the Classes to suffer actual damages, including but not limited to diminished value of their vehicles, and

43

have recklessly placed Plaintiff and members of the Classes, the occupants of the

Class Vehicles and the public at risk.

**D.    FCA Touted Safety in Its Marketing and Advertising**

95.    Maintaining that safety is purportedly one of the company's primary

goals, specifically, FCA has touted its "commitment" and "dedication" to

"transportation safety includ[ing] engineering active and passive features for

diverse drivers and vehicle segments."[26]   Amid worsening reliability ratings and

recall investigations from NHTSA,[27] FCA's head of vehicle safety and regulatory

compliance assured the market in 2014 that "safety considerations are baked into

every component of every product we make."[28]

---

[26] Exhibit L, 2015 Sustainability Report, Vehicle Safety, FCA GROUP, http://reports.fcagroup.com/sustainability/2015/products-and-processes/product-innovation-and-responsible-mobility/vehicle-safety#start (last visited on Dec. 16, 2016) ("2015 Sustainability Report").

[27] Exhibit M, Michael Wayland, *Quality Chief Leaves FCA Amid Recalls, Poor Reliability*, THE DETROIT NEWS (Oct. 29, 2014), http://www.detroitnews.com/story/business/autos/chrysler/2014/10/28/fiat-chrysler-replaces-longtime-quality-chief/18052121/ ("2014 Detroit News Article").

[28] Exhibit N, Sandy Smith, *Sandy Says: Are You a Safety Advocate?*, EHS TODAY, (Feb. 4, 2016), http://ehstoday.com/safety-leadership/sandy-says-are-you-safety-advocate ("February 2016 EHS Today Article").

96.     On its website, FCA represents that its "objective is to ensure vehicle quality and safety."[29]  Defendant informs consumers that FCA "vehicles meet the highest standard in terms of safety, ecological profile, driving performance and quality."[30]  Specifically, FCA's website focuses on Defendant's purported rigorous testing and quality control:

> To ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, every mechanical and electronic component, body part and trim element is rigorously tested.  The designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality.[31]

97.     With regard to the Dodge Charger, FCA's Dodge brand website states "safety and security is a priority."[32]  Adding, that "[a] modern, powerful ride should first and foremost protect."[33]  The Dodge Charger website also states "safety and security are built in," the "Dodge Charger is helping keep you and your

---

[29]    Exhibit    O,    The    Group,    Brand    Stories,    FCA    GROUP, http://www.fcagroup.com/en-US/group/brand_stories/Pages/quality_lifecycle.aspx (last visited Dec. 20, 2016) ("FCA Group Brand Stories").

[30] *Id*.

[31] *Id.*

[32] Exhibit P, Vehicles, Charger, Dodge, http://www.dodge.com/en/charger/ (last visited Dec. 20, 2016) ("Dodge Charger Safety and Security Screenshot 1").

[33] Exhibit Q, Vehicles, Charger, Safety & Security, Dodge, http://www.dodge.com/ en/charger/safety_security/ (last visited Dec. 16 2016) ("Dodge Charger Safety and Security Screenshot 2").

passengers safe and secure."[34]   Advertisements for the Dodge Charger include that the vehicle is "always on guard" and "the Dodge Charger packs more than 80 standard and available safety and security features to help keep drivers and passengers protected":[35]



---

[34] *Id.*

[35] *Id.*



98.   FCA touts the same safety messages for the Chrysler 300, stating "[t]he Chrysler 300 Offers Over 80 Standard and Available Safety and Security Features."[36]



99.   Defendant claims that "[s]ince 1941, when the first Jeep was built, the brand has continued to produce unique, versatile and capable vehicles. Jeep delivers customers an experience that no other automotive brand can offer."[37]

---

[36] Exhibit R, http://mydigimag.rrd.com/publication/?i=278297 (last visited Dec. 16, 2016) ("Chrysler 300 Safety and Screen Screenshot").

[37] Exhibit S, FCA Group, https://www.fcagroup.com/en-US/group/brands/Pages/jeep.aspx (last visited Dec. 21, 2016) ("Jeep Brands Screenshot").

100.   FCA describes the Jeep Grand Cherokee as having "[o]ver 70 available safety and security features" and "protection when and where you need it."[38]   Its website conveys to consumers that the Jeep Grand Cherokee is "[a]t the forefront of the latest safety and security systems."[39]   Advertisements also claim that the vehicle is "[s]afe, secure, and in control."[40]



101.   FCA made these repeated claims and advertisements touting its dedication to safety to boost Class Vehicle sales while knowing that it was selling hundreds of thousands of Class Vehicles equipped with the Defective Shifter, which had a known defect that violated basic design guidelines and an associated safety risk and which incorporated no safety override function to ensure Class

---

[38] Exhibit T, Vehicles, Grand Cherokee, Jeep, http://www.jeep.com/en/2016/grand-cherokee/safety-security/ (last visited Dec. 16, 2016) ("Jeep Safety and Security Screenshot").

[39] *Id.*

[40] *Id.*

Vehicles were in the proper gear and would not unexpectedly rollaway or shift into unintended gears.

### E.   FCA Knew About the Defective Shifter and Associated Safety Risks

102.   Defendant fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Classes the defect in the Class Vehicles even though Defendant knew or should have known of design and manufacturing defects in Class Vehicles and that the vehicles' design violated basic guidelines.

103.   Knowledge and information regarding the Defective Shifter were in the exclusive and superior possession of Defendant and its dealers, and that information was not provided to Plaintiffs and members of the Classes.  Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendant's network of exclusive dealers and NHTSA, basic design guidelines, and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the defect in the Defective Shifter and fraudulently concealed the defect and safety risk from Plaintiffs and members of the Classes.

104.   Defendant knew, or should have known, that the defect in the Defective Shifter and associated safety risk were material to owners and lessees of

the Class Vehicles and were not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles.

105.   Notwithstanding Defendant's exclusive and superior knowledge of the Defective Shifter, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the defect through the 2015 model year.  Until April 2016, Defendant intentionally concealed that the Defective Shifter violated basic design guidelines and presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

## 1.    NHTSA Complaints

106.   Soon after Class Vehicles entered the market in early 2011, FCA became aware of the design defect associated with the Defective Shifter that potentially leads to dangerous rollaway incidents.  According to NHTSA-ODI, "FCA received negative consumer feedback for the Monostable shifters shortly after the subject vehicles [Class Vehicles] entered the market."[41]  Further, "[f]ield data indicate that the design resulted in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents."[42]

---

[41] Exhibit B (NHTSA-ODI Resume 2).

[42] *Id.*

107.   Consumers who purchased or leased Class Vehicles have filed hundreds of complaints with NHTSA reporting dangerous rollaway incidents, collisions and injuries and detailing the defect in the Class Vehicles equipped with the Defective Shifter.

108.   Federal law requires FCA to monitor defects which can cause a safety issue and report them within five (5) days.   FCA regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided knowledge of the Defective Shifter through these complaints, *inter alia*.

109.   Below is a sample of consumer complaints made to NHTSA regarding Class Vehicle rollaway incidents and/or incidents where Class Vehicles did not remain in the desired gear:

**2012 to 2014 Chrysler 300**

- **Date Complaint Filed: 02/26/2014**

  **Date of Incident:** 12/16/2013
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10566108
  **Consumer Location:** LENAPAH, OK
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2013
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAAG6DH...

**SUMMARY:**

TL- THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE'S TRANSMISSION WAS IN THE PARK POSITION WITH THE ENGINE TURNED ON BEFORE SHE EXITED THE VEHICLE. APPROXIMATELY 4 MINUTES LATER THE VEHICLE SUDDENLY BEGAN TO DRIVE BACKWARDS AND CRASHED INTO A SECOND VEHICLE. THE CONTACT INDICATED THAT THE PASSENGER IN THE FRONT PASSENGER SEAT WAS ABLE TO MOVE INTO THE DRIVERS SEAT AND STOP THE VEHICLE BY PRESSING THE BRAKES. THE CONTACT INDICATED THAT THE PARKING BREAK WAS NOT ENGAGED DURING THE INCIDENT. NO INJURIES WERE REPORTED AND NO POLICE REPORT WAS TAKEN. THE VEHICLE WAS DIAGNOSED AT THE DEALER AND THE CONTACT WAS INFORMED THAT THE DEFECT WAS DUE TO A SOFTWARE MALFUNCTION. NO ADDITIONAL INFORMATION WAS AVAILABLE. NO REPAIRS WERE PERFORMED. THE FAILURE MILEAGE WAS 39,000. JFT

- **Date Complaint Filed: 01/14/2015**

  **Date of Incident:** 01/14/2015
  **Component(s):** ENGINE AND ENGINE COOLING , POWER TRAIN
  **NHTSA ID Number:** 10672445
  **Consumer Location:** HUNTINGTON WOODS, MI
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAGG1EH...

**SUMMARY:**

WHEN I PUT THE CAR INTO PARK, IT POPS INTO REVERSE. THEN I HIT THE ENGINE OFF BUTTON, BUT SINCE IT IS IN REVERSE, THE ENGINE STAYS ON. THEN I OPEN THE DOOR TO GET OUT, THINKING THE ENGINE IS OFF AND THE CAR IS IN PARK, AND IT STARTS ROLLING BACKWARD. THIS HAS HAPPENED 6 TIMES. THE CAR IS IN THE SHOP NOW. *TR

- **Date Complaint Filed: 02/08/2016**

  **Date of Incident:** 02/01/2016
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10824981
  **Consumer Location:** ENGLEWOOD, FL
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2013
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAKG5DH...

**SUMMARY:**
VEHICLE SHIFTER WILL NOT OPERATE PROPERLY, THERE ARE TIMES I THOUGHT CAR WAS IN PARK AND IT WAS IN REVERSE. I MOVE SHIFTER FROM PARK TO DRIVE AND IT IS STILL IN PARK. GO TO PUT IT IN REVERSE AND IT BYPASSES THE GEAR. TIMES I PUT IT IN DRIVE AND IT IS IN NEUTRAL. TAKEN CAR BACK TO DEALER FOR PROBLEM AND WAS TOLD TO LIVE WITH IT, NOTHING CAN BE DONE. ONE TIME I GOT OUT THINKING CAR WAS IN PARK AND IT WAS IN REVERSE AND STARTED TO MOVE, LUCKILY I WAS IN A FLAT PARKING AREA AT THE TIME.

- **Date Complaint Filed: 02/09/2016**

  **Date of Incident:** 01/01/2015
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10825219
  **Consumer Location:** TUCSON, AZ
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAAG5EH...

54

**SUMMARY:**

I FEEL THE GEAR SELECTOR ON MY 2014 CHRYSLER 300 IS VAGUE, CONFUSING, AND DANGEROUS. IT IS ELECTRONIC AND PIVOTS INSTEAD OF MOVING ONE SPOT FOR EACH GEAR SELECTION. IF YOU PARK AND ATTEMPT TO SHIFT FROM DRIVE TO PARK SOMETIMES IT MAKES IT AND SOMETIMES IT ENDS UP IN REVERSE. WHEN THIS HAPPENS THE ENGINE DOES NOT TURN OFF WHEN YOU PUSH THE STOP BUTTON AND AS YOU STEP OUT THE CAR TAKES OFF BACKWARDS. ALSO WHEN SHIFTING FROM PARK TO DRIVE SOMETIMES IT GOES PAST DRIVE AND INTO LOW, SO I ENDED UP DRIVING FOR A TIME STUCK IN LOW GEAR AND NOT KNOWING UNTIL YOU GO TO SLOW OR STOP AND IT FEELS LIKE THE BRAKES ARE STUCK ON SO YOU START LOOKING FOR THE REASON. I HAVE HATED THIS CAR ALMOST SINCE I LEASED IT IN DECEMBER OF 2014. I FEEL WITH THE LACK OF A SWITCH KEY TO TURN THE ENGINE ON AND OFF, AND THIS VAGUE GEAR SELECTOR THIS GROUP OF VEHICLES IS AN ACCIDENT WAITING TO HAPPEN. I HAVE TRIED TO TRADE IT IN BUT I STILL HAVE 13 MONTHS LEFT AND CAN DO NOTHING. PLEASE LOOK INTO THIS...THANK YOU *TR

- **Date Complaint Filed: 05/09/2016**

  **Date of Incident:** 02/07/2016
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10863977
  **Consumer Location:** GLASTONBURY, CT
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2014
  Crash: Yes
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAAGXEH...

**SUMMARY:**

ON FEBRUARY 7, 2016, MY HUSBAND PARKED HIS 2014 CHRYSLER 300 IN A PARKING SPOT IN A PARKING LOT AND EXITED THE VEHICLE WITH THE ENGINE RUNNING. I WAS SEATED IN THE FRONT PASSENGER SEAT WITH OUR 11 YEAR-OLD CHILD BEHIND ME AND 9

YEAR-OLD CHILD SEATED BEHIND THE DRIVER'S SEAT. ALL 3 OF US WERE WEARING SEAT BELTS. MY HUSBAND WALKED ACROSS THE PARKING LOT AND DOWN THE BLOCK. I WAS TEXTING SOMEONE ON MY CELLPHONE WHEN MY 11 YEAR-OLD EXCLAIMED THAT THE CAR WAS MOVING. WITHOUT LOOKING UP FROM MY PHONE, I EXPLAINED TO HER THAT IT WAS PROBABLY THE ILLUSION OF A CAR PULLING INTO OR OUT OF THE PARKING SPOT BESIDE US. SHE SCREAMED, "NO THE CAR IS DEFINITELY MOVING!" THE CAR WAS ACCELERATING BACKWARDS. I MADE EVERY EFFORT TO MOVE THE GEARSHIFT, GRAB THE STEERING WHEEL AND HIT THE BRAKES BUT DUE TO THE SIZE OF THE LARGE CONSOLE I COULD NOT SWING MY LEG OVER TO REACH THE BRAKE. THE CAR MOVED IN REVERSE ACROSS THE PARKING LOT AND STRUCK AN UNOCCUPIED VEHICLE THAT WAS PARKED ON THE OPPOSITE SIDE OF THE LOT. THANKFULLY, THE CAR DID NOT STRIKE ANY PEDESTRIANS OR OCCUPIED VEHICLES, AS THIS WAS A BUSY PARKING LOT. OUR CHRYSLER ENDURED SIGNIFICANT DAMAGE WHILE THE DAMAGE TO THE OTHER VEHICLE WAS MINOR. MY CHILDREN AND I WERE EXTREMELY UPSET. WE ARE VERY GRATEFUL THAT NO ONE WAS PHYSICALLY INJURED BUT WE WERE ALL QUITE SHAKEN BY THE OUT OF CONTROL CAR. THE IMPACT WAS SUCH THAT IT MAKE A LOUD "THUD" SOUND WHEN IT COLLIDED WITH THE OTHER VEHICLE AND JOLTED US A BIT. WE WERE COMPLETELY SHOCKED THAT THE CAR SEEMINGLY ON IT'S OWN WENT FROM "PARK" INTO "REVERSE". MY HUSBAND HAD TIME TO WALK ACROSS THE PARKING LOT AND DOWN THE BLOCK BEFORE THE VEHICLE STARTED TO MOVE. THE VEHICLE WAS LONG OUT OF HIS SIGHT BEFORE IT STARTED TO MOVE. THIS CAR IS DANGEROUSLY DEFECTIVE. WE REPORTED THIS INCIDENT TO OUR INSURANCE CARRIER THE NEXT DAY.

**2012 to 2014 Dodge Charger**

- **Date Complaint Filed: 04/13/2013**

  **Date of Incident:** 01/01/2013
  **Component(s):** POWER TRAIN, VISIBILITY/WIPER
  **NHTSA ID Number:** 10508134
  **Consumer Location:** VERNON, CT
  **Vehicle MakeModelModel Year(s)**
  DODGE CHARGER 2012

Crash: No
Fire: No
Number of Injuries: 0
Number of Deaths: 0
**Manufacturer:** Chrysler (FCA US LLC)
**Vehicle Identification No. (VIN):** 2C3CDXHG0CH...

**SUMMARY:**
CAR ROLLED EVENTHOUGH VEHICLE WAS IN PARK AND VEHICLE
WAS NOT RUNNING. 1ST INCIDENT HAPPENED WITHIN 10 MIN OF
WALKING AWAY FROM CAR, ROLLED INTO ANOTHER CAR. 2ND
INCIDENT HAPPENED NEARLY 2 HOURS AFTER BEING PARKED, AND
3RD INCIDENT HAPPENED WITHIN 1 HOUR OF BEING PARKED ON
SLIGHT INCLINE. DEALER UNABLE TO RECREATE INCIDENT. FACTOR
REP CALLED DODGE, DODGE CALLED TRANSMISSION MFG AND HAD
VALVE COM REPLACED. NO FURTHER INCIDENT 2ND PROBLEM,
WINDSHIELD HAS WAVE IN GLASS, WIPERS LEAVING LARGE
STREAKS CAUSING DRIVER TO HAVE SAFETY ISSUE. DEALER
POLISHED WINDSHIELD 3X TO NO AVAIL. CONTACTED DODGE
WAITING FOR FACTORY REP TO AUTHORIZE REPLACEMENT OF
WINDSHIELD ON GOING FOR ALMOST 10 MONTHS. *TR

- **Date Complaint Filed: 06/03/2014**

  **Date of Incident:** 05/03/2014
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10595813
  **Consumer Location:** LAUREL, MD
  **Vehicle MakeModelModel Year(s)**
  DODGE CHARGER 2012
  Crash: Yes
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CDXHG5CH...

**SUMMARY:**
PARKED AUTO ON GRAVEL PARKING LOT. THE DRIVE SELECT DID GO
INTO THE PARK POSITION UPON SHUT-DOWN AND THE ENGINE DID

NOT TURN OFF WHEN THE IGNITION BUTTON WAS DEPRESSED. NO ENGINE SOUND APPARENT DUE LOW RPM AND GOOD SOUND SUPPRESSION MATERIAL. EXCITED THE VEHICLE AND LOCKED CAR DOOR.THE CAR DID NOT MOVE AS I LEFT THE AREA.SUBSEQUENT TO MY DEPARTURE,THE TORQUE BUILT UP ENOUGH TO PROPEL THE CAR ACROSS THE PARKING LOT AND INTO A TREE IN FRONT OF A PRIVATE RESIDENT ADJACENT TO THE FAIR GROUNDS. *TR

- **Date Complaint Filed: 02/08/2016**

  **Date of Incident:** 09/19/2015
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10824970
  **Consumer Location:** ALIQUIPPA, PA
  **Vehicle MakeModelModel Year(s)**
  DODGE CHARGER 2012
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CDXJG5CH...

**SUMMARY:**
VEHICLE ROLLAWAY, ENGINE ON. RE: ODI PE15-30 AND EA 16-002. I EXITED MY VEHICLE WITH THE ENGINE RUNNING AND THE TRANSMISSION WAS NOT IN PARK. THE VEHICLE HILL START ASSIST GAVE ME ENOUGH TIME TO EXIT THE VEHICLE AND THEN IT BEGAN TO ROLL BACKWARD. THE OPEN DRIVER'S SIDE DOOR KNOCKED ME DOWN AND DRAGGED ME 50 FEET. MY RIGHT LEG AND FOOT WENT UNDER THE LEFT FRONT WHEEL WHICH PULLED ME OUT FROM UNDER THE OPEN DOOR. THE VEHICLE CONTINUED ROLLING BACKWARD OVER AN EMBANKMENT AND CRASHED ON THE ROAD BELOW. THE VEHICLE WAS A TOTAL LOSS AND I SUSTAINED A SEVERE SPRAIN TO MY RIGHT FOOT. I HAVE PICTURES AND AN INSURANCE CLAIM REPORT TO PROVIDE PROOF OF THIS INCIDENT.

**<u>2014-2015 Jeep Grand Cherokee</u>**

- **Date Complaint Filed: 12/12/2013**

  **Date of Incident:** 12/12/2013
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10824970
  **Consumer Location:** MAHWAH, NJ
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: Yes
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFBG1EC...

**SUMMARY:**
FROM A STOPPED POSITION IN PARK, CAR SPONTANEOUSLY SHIFTED
INTO NEUTRAL. *TR

- **Date Complaint Filed: 03/06/2014**

  **Date of Incident:** 11/01/2013
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10567538
  **Consumer Location:** Unknown
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFCG0EC...

**SUMMARY:**
PARKING VEHICLE AND PUTTING INTO PARK. EXITED THE VEHICLE
AND CAR STARTED MOVING. SHIFTER WAS NOT IN PARK. VERY
FUSSY SHIFTER. YOU CAN NOT TELL IT'S IN PARK UNLESS YOU LOOK

EACH TIME. EVEN THOUGH YOU PUSH IT ALL THE WAY UP SOMETIMES IT IS NOT IN PARK. I HAD THE CAR START ROLLING SEVERAL TIMES AFTER EXITING THE CAR. *TR

- **Date Complaint Filed: 04/17/2014**

  **Date of Incident:** 04/07/2014
  **Component(s):** POWER TRAIN , STRUCTURE
  **NHTSA ID Number:** 10583366
  **Consumer Location:** FORT COLLINS, CO
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFCT2EC...

**SUMMARY:**

HAVE A LONG NARROW DRIVEWAY WITH A BIT OF A SLOPE TOWARD THE HOUSE. WHEN GOING OUT THE DRIVEWAY I SEEN A TRASH CONTAINER TIPPED OVER. I PUT THE VEHICLE IN PARK, LETTING IT IDLE, WHILE I EXITED THE VEHICLE TO REMOVE THE CONTAINER. LOOKING BACK I SEEN THE JEEP BACKING DOWN THE DRIVEWAY TOWARD THE HOUSE UNDER IT'S OWN POWER. I TRIED CATCH IT,BUT IT HIT THE SIDE OF THE HOME ON A GARAGE WALL. TOTAL DAMAGE TO THE VEHICLE IS AROUND $9400 I'VE YET TO GET THE HOUSE DAMAGE ESTIMATE BACK. I DIDN'T SEE IF THE VEHICLE WAS IN PARK OR REVERSE WHEN I EXITED. I PUSHED THE SHIFTER CLEAR FORWARD TILL IT STOPPED, THEN EXITED. THE SHIFTER HAS TO GO THRU REVERSE BEFORE IT GETS TO PARK. IN THE PAST I'VE NOTICED THAT IT DID NOT ALWAYS GO INTO PARK WHEN I HAD PUT IT THERE. I DRIVE LIKE NORMAL PEOPLE DRIVE. I HAVE 55+ YEARS OF DRIVING EXPERIENCE. WE SHIFT BY FEEL AND NOT ALWAYS LOOKING DOWN AT THE SHIFTER. WHEN A SHIFT LEVER GOES THRU THE MOTION FORWARD AND STOPS, WE EXPECT IT TO BE IN PARK, NOT REVERSE. THIS IS A MAJOR FLAW IN THE VEHICLE. I LOVE THE NEW 8 SPEED TRANSMISSION, BUT DON'T TRUST THE SHIFTING MECHANISM. MY WIFE IS VERY RELUCTANT TO DRIVE IT BECAUSE OF THIS ISSUE. I'VE

CONTACTED CHRYSLER ABOUT THE ISSUE. THEY SEEM CONCERNED AND ARE WANTING TO LOOK AT THE VEHICLE WHEN REPAIRED. HOWEVER, I'M NOT CERTAIN, HEARING ABOUT OTHER ISSUES WITH VEHICLES, WHETHER THEY ARE JUST TRYING TO BLOW SMOKE UNTIL I QUITE DOWN. I DID OBTAIN A LEG INJURY WHEN ATTEMPTING TO STOP THE VEHICLE. NOT SERIOUS, BUT SURELY COULD HAVE BEEN. HAD THERE BEEN A CHILD, PET OR OTHER PERSON BEHIND THE VEHICLE, IT COULD HAVE BEEN DISASTROUS. THERE NEEDS TO BE A FIX TO THIS PROBLEM. I HAVE A FAMILY MEMBER THAT WORKS FOR STATE FARM INSURANCE. THEY'VE ALSO HAD SIMILAR COMPLAINTS. THERE'S NOT DETENT IN THE SHIFTING, IT JUST GOES FORWARD AND STOPS. ALL ELECTRONIC, NOT MECHANICAL AS THEY USED TO BE.

- **Date Complaint Filed: 12/05/2014**

  **Date of Incident:** 12/05/2014
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10567538
  **Consumer Location:** VALLEY COTTAGE, NY
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFBG4EC...

**SUMMARY:**

ON 3 SEPARATE OCCASIONS IN THE LAST TWO WEEKS MY 2014 JEEP GRAND CHEROKEE HAS ROLLED UNEXPECTEDLY ONCE THE TRANSMISSION HAS BEEN PUT INTO PARK AND THE ENGINE TURNED OFF. THE FIRST TIME IT HAPPENED, I DROVE INTO A SLOPED DRIVEWAY. I PUT THE CAR INTO PARK, TURNED OFF THE CAR, AND SAT IN THE DRIVER'S SEAT TO COMPOSE AN E-MAIL. MY FOOT CONTINUED TO BE ON THE BRAKE. A MINUTE OR SO LATER, WHEN I COMPLETED MY TASK, I OPENED THE DOOR AND BEGAN TO GET OUT, HAVING NOT PUT ON THE EMERGENCY BRAKE. AS IT WAS A GENTLE SLOPE, I DID NOT NOTICE THE CAR BEGINNING TO ROLL

IMMEDIATELY, BUT ONCE OUTSIDE THE CAR I REALIZED IT WAS ROLLING BACKWARDS. I TURNED AND GOT BACK INTO THE CAR AND APPLIED THE EMERGENCY BRAKE, ALMOST FALLING IN THE PROCESS. AT THE TIME I THOUGHT THAT I MIGHT HAVE PUT THE CAR INTO NEUTRAL RATHER THAN PARK, AS THE GEAR SHIFT IS ELECTRONIC, AND IS SLIGHTLY DIFFERENT IN FEEL FROM OLDER TRANSMISSIONS. BELIEVING THAT IT WAS MY ERROR, I DID NOTHING ABOUT THIS. THEN, OVER THIS PAST WEEKEND IT HAPPENED AGAIN, AND I WROTE TO JEEP VIA THEIR OWNER PORTAL, TO ENSURE THAT IT WAS REPORTED. ON DECEMBER 3RD, I SCHEDULED A SERVICE FOR FRIDAY DECEMBER 5TH. YESTERDAY, DECEMBER 4TH, I TOOK THE CAR TO A CAR WASH. THE ATTENDANT WAS DOING DETAIL WORK, AND AFTER TAKING IT THROUGH THE WASH, HE PARKED IT. I WALKED TOWARD THE CAR, AND HE GOT OUT OF THE CAR ONCE HE HAD PUT IT INTO PARK AND TURNED IT OFF. HE EXITED JUST AS I GOT TO THE FRONT DRIVER'S SIDE CORNER. THE CAR BEGAN TO ROLL AGAIN, AND WAS ON A SLOPE. HAD THE ATTENDANT NOT JUMPED BACK INTO THE CAR AND APPLIED THE BRAKE, BOTH OF US WOULD HAVE BEEN PINNED IN PLACE, ME BETWEEN THE DOOR AND A LARGE CEMENT PLANTER, AND HE BETWEEN THE DOOR AND THE INTERIOR. I QUICKLY VIDEOTAPED THE ATTENDANT BRIEFLY RECOUNTING THE STORY, AND OBTAINED HIS CONTACT INFORMATION, AS WELL. THE JEEP IS NOW AT THE DEALERSHIP. *TR

- **Date Complaint Filed: 04/21/2015**

  **Date of Incident:** 09/08/2014
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10711893
  **Consumer Location:** METHUEN, MA
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2015
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** Not Available

**SUMMARY:**

WHEN MOVING THE GEAR SHIFT ALL THE UP FROM DRIVE TO PARK THE CAR IS NOT ALWAYS IN PARK BUT REVERSE. THIS HAS HAPPENED MULTIPLE TIMES AND THE CAR WILL BEGIN MOVING BACKWARD WHEN I TAKE MY FOOT OF THE BRAKE. IT SEEMS LIKE THE COMPUTER IS NOT QUICK ENOUGH TO RECOGNIZE THE MOVEMENT OF THE SHIFTER. VERY DANGEROUS BUT NOW I AM AWARE OF IT.

- **Date Complaint Filed: 06/29/2015**

  **Date of Incident:** 06/28/2015
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10730952
  **Consumer Location:** LIVONIA, MI
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2015
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFAG3FC...

**SUMMARY:**

VEHICLE WAS PUT INTO PARK WHILE RUNNING. THE VEHICLE THEN STARTED TO ROLL BACKWARDS WHILE STILL IN PARK AND THEN COLLIDED INTO ANOTHER PARKED VEHICLE. WHILE THE VEHICLE WAS ROLLING BACKWARDS 3 OTHER OCCUPANTS PROCEEDED TO EVACUATE THE VEHICLE BEFORE IT COLLIDED WITH THE OTHER PARKED CAR. THE EVACUATION OF THE VEHICLE LEFT THE DOORS OPEN WHICH, WHEN THE VEHICLES COLLIDED, LEFT THE DOORS OF THE ROLLING VEHICLE (THE JEEP) UNABLE TO BE CLOSED.*UPDATED* THE DRIVER LEFT THE VEHICLE TO GO INTO A GAS STATION, THE SHIFT INDICATOR SHOWED THE VEHICLE TO BE IN PARK. THE VEHICLE STARTED TO ROLLAWAY, THE TWO CHILDREN AND THE ADULT PASSENGER EVACUATED THE VEHICLE AS THEY THOUGHT IT MIGHT ROLL INTO STREET TRAFFIC AND BE STRUCK. A CHILD WAS INJURED EXITING THE VEHICLE AS THE VEHICLE COLLIDED WITH ANOTHER PARKED VEHICLE, AND THEN CONTINUED

ON ROLLING INTO A DITCH. A BYSTANDER JUMPED IN THE VEHICLE TO TRY TO STOP THE ROLLING AND NOTICED THAT THE SHIFT INDICATOR WAS SHOWING THE VEHICLE WAS IN PARK.*SMCH....UPDATED 04/25/16 *BF

- **Date Complaint Filed: 09/04/2015**

  **Date of Incident:** 12/12/2014
  **Component(s):** ELECTRICAL SYSTEM , POWER TRAIN
  **NHTSA ID Number:** 10761498
  **Consumer Location:** LITCHFIELD, MN
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2015
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** Not Available

**SUMMARY:**

ON DECEMBER 5, 2014, I ACCEPTED DELIVERY OF A NEW 2015 MODEL YEAR JEEP GRAND CHEROKEE OVERLAND 4X4, EQUIPPED WITH AN 8-SPEED PADDLE-SHIFT AUTOMATIC TRANSMISSION AND ?KEYLESS ENTER ?N GO.? ON DECEMBER 12, 2014, I WAS TRAVELLING WITH A FRIEND. WHEN WE REACHED OUR DESTINATION, I PULLED TO THE SIDE OF THE PAVED STREET, PLACED THE VEHICLE IN ?PARK,? PRESSED THE ?ON OFF? BUTTON TO SHUTOFF THE ENGINE, AND EXITED THE VEHICLE THROUGH THE DRIVER?S DOOR. THE PASSENGER HAD EXITED THE FRONT PASSENGER DOOR, AND WAS COMING AROUND THE REAR OF THE VEHICLE. (IT SHOULD BE NOTED THAT NEITHER I NOR MY PASSENGER HAD TO ?UNLOCK? OUR DOORS TO EXIT THE VEHICLE, CONFIRMING I HAD PLACED THE VEHICLE IN ?PARK.?) AS SHE APPROACHED THE LEFT REAR OF THE VEHICLE, SHE REMARKED THAT I HAD NOT SHUT THE VEHICLE OFF. AS I REPLIED, ?YES, I DID,? I NOTICED EXHAUST COMING FROM THE VEHICLE?S TAILPIPE. I RETURNED TO THE DRIVER?S DOOR, OPENED THE DOOR, REACHED IN AND PRESSED THE ?ON OFF? BUTTON 2-3 TIMES; THE VEHICLE WOULD NOT SHUT OFF. AS I WAS PRESSING THE ?ON OFF? BUTTON I BELIEVE I HEARD THE ENGINE ?REV? AND THE VEHICLE

BEGAN TRAVELLING IN REVERSE. I WAS CAUGHT BETWEEN THE
OPEN DRIVER?S DOOR AND THE VEHICLE AND DRUG ALONG. I
REACHED IN AND GRABBED THE STEERING WHEEL IN AN ATTEMPT
TO PULL MYSELF IN AND GAIN CONTROL OF THE VEHICLE. I WAS
UNABLE, AND FINALLY LET GO OF THE WHEEL AND DROPPED INTO
THE MIDDLE OF AN INTERSECTION. AS THE VEHICLE PROCEEDED
ACROSS THE INTERSECTION IT BACKED INTO A WOODEN FENCE
WHERE IT CAME TO REST, IDLING. A RESPONDING SHERIFF?S DEPUTY
ARRIVED ON THE SCENE, AND HE TOLD ME HE WAS UNABLE TO
PLACE THE VEHICLE INTO ?PARK.? I SUSTAINED SOFT TISSUE
INJURIES TO MY LEG(S).....UPDATED 04/25/16 *BF

### F.    FCA Stopped Installing the Defective Shifter in its Vehicles

110.   Beginning in or before 2014, FCA stopped installing the Defective

Shifter in its vehicles and began equipping its 2015 Dodge Charger and 2015

Chrysler 300 with a Polystable Shifter.  But it kept the Defective Shifter in the Jeep

Grand Cherokee until the 2016 model year.  According to FCA, in order "[t]o

address customer-satisfaction issues, [FCA] began equipping the [Dodge] Charger

and [Chrysler] 300 with a new shift-lever design in model-year 2015" and the

"[Jeep] Grand Cherokee's shift-lever was updated in model-year 2016."[43]

111.   NHTSA has found that Polystable Shifters reduce the safety risks

associated with the Defective Shifter, stating that "Polystable gearshift assemblies

stay in the position of the selected gear, similar to a standard mechanical shifter,

---

[43] Exhibit C (Recall Press Release).

providing drivers with the expected tactile and visual feedback (i.e., works as expected and does not require additional thought or attention)."[44]

### G.    NHTSA Confirms a Design Defect in the Defective Shifter

112.   Between August 2015 and February 2016, NHTSA investigated the Defective Shifter, and informed FCA that "it is concerned that the design of the shifters is confusing for drivers."[45]

113.   On August 20, 2015, NHTSA-ODI opened Preliminary Evaluation PE15-030, to investigate fourteen reports of rollaways in 2014 and 2015 Jeep Grand Cherokee vehicles.[46]   In November 2015, FCA responded to 10 pages of detailed questions from NHTSA, but that response has not been made publically available on the agency's website.[47]

114.   On February 3, 2016, NHTSA released an update regarding Preliminary Evaluation PE15-030 and announced that an Engineering Analysis had

---

[44] Exhibit B (NHTSA-ODI Resume 2).

[45] Exhibit U, Brent Snavely, *NHTSA expands probe into FCA gear shifters*, DETROIT FREE PRESS (Feb. 9, 2016), http://www.freep.com/story/money/cars/chrysler/2016/02/08/nhtsa-expands-investigation-into-fca-gear-shifters/80019028/ ("February 2016 Detroit Free Press Article").

[46] *See* Exhibit A (NHTSA-ODI Resume 1).

[47] Exhibit V, Christopher Jensen, *Anton Yelchin's Death Highlights a Known Issue With Jeeps*, THE NEW YORK TIMES (June 21, 2016), http://www.nytimes.com/2016/06/22/business/anton-yelchins-death-highlights-a-known-issue-with-jeeps.html?_r=0 ("2016 New York Times Article").

been opened regarding rollaway incidents involving the Class Vehicles.[48]

Initially, NHTSA reported 121 accidents and 30 injuries as a result of the

Defective Shifter.[49]

115. NHTSA described the defect as follows:

> The MY 2014-2015 Grand Cherokee vehicles are equipped with Monostable electronic ("E-shift") gearshift assemblies supplied by ZF Group (ZF). The E-shift system operates electronically and the gear requested by the driver is transmitted from the shifter via the CAN Bus to the Transmission Control Module which makes the requested shift. The Monostable gearshift does not move into a detent but springs back to a centered/neutral position after the driver selects a gear and releases the shifter. A button on the shift knob must be depressed to shift out of Park, shift out of Neutral, and to shift from Drive to Reverse or Park.

> The gear selected is shown on a display in the dash and illuminated letters on the shifter. If the driver's door is opened when the gearshift is not in Park, a chime sounds and a message is displayed on the EVIC to warn the driver. In addition, the engine Start/Stop push-button control logic does not permit normal engine shut-off when the transmission is not in Park. This logic may provide feedback to drivers who attempt to turn the engine off when the transmission is not in Park. ***However, this function does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.***[50]

---

[48] *See* Exhibit A (NHTSA-ODI Resume 1).

[49] *See id.*

[50] *Id.* (emphasis added).

116.   In February 2016, NHTSA confirmed that the Defective Shifter is poorly designed, stating that its testing "***indicates that operation of the Monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection***."[51]

117.   Through ODI's investigation, NHTSA "identified 306 incidents of vehicle rollaway following intended shifts to Park in the 2014-2015 Grand Cherokee."[52]   The ODI's analysis of these incidents determined that the incidents resulted in 117 alleged crashes and caused the following injuries:

> Twenty-eight of the crashes reportedly caused injuries, including 3 with a fractured pelvis and 4 others requiring some degree of hospitalization (a ruptured bladder, fractured kneecap, broken ribs, damaged to right leg).  Other injuries include reports of a broken nose, facial lacerations requiring stitches, sprained knees, severe bruising, and trauma to legs.[53]

118.   NHTSA also confirmed that, in addition to model-year 2014 to 2015 Jeep Grand Cherokees, model-year 2012 to 2014 Chrysler 300 and Dodge Charger vehicles with 3.6L engines are equipped with the Defective Shifter.[54]

119.   On April 22, 2016, FCA submitted a Defect Information Report, informing NHTSA that "[t]he existing strategies built into these vehicles to deter drivers from exiting the vehicle after failing to put the transmission into PARK

---

[51] *Id.* (emphasis added).

[52] *Id.*

[53] *Id.*

[54] *See id.*

have not stopped some from doing so."[55]   FCA admitted that "[d]rivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged."[56]

120.   NHTSA continued to investigate the Defective Shifter and perform its Engineering Analysis through June 24, 2016.  As a result of this analysis, NHTSA found the Defective Shifter "appears to violate several basic design guidelines for vehicle controls, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[57]

121.   NHTSA concluded that the "[a]udible chimes" and "visual warning[s]" provided to alert drivers that the vehicle is not in Park when the engine is running and the driver's door is opened are ineffective.[58]   NHTSA stated:

> Based on ODI's interviews with complainants, in some incidents the driver believed they had left the vehicle idling in Park when they exited, but the vehicle was not in Park.  In other incidents the drivers believed they had turned the engine Off after shifting to Park, but failed to recognize that the

---

[55] Exhibit B (NHTSA-ODI Resume 2) (emphasis added).

[56] *Id.* (emphasis added).

[57] *Id.*

[58] *Id.*

engine did not shutoff and the vehicle was not in Park.  The engine noise at idle is not obvious to many drivers who may not recognize that the engine continues to run after attempted shutoff.[59]

122.   Lastly, NHTSA identified one fatal crash potentially related to one of the Class Vehicles, a 2015 Jeep Grand Cherokee, stating:

> In addition to the crashes and injuries documented in this closing resume, ODI is aware of a fatal incident involving a recalled 2015 Jeep Grand Cherokee that occurred over the weekend of June 18-19, 2016 in Studio City, California that may be related to the alleged defect.  The incident is being investigated by the Los Angeles Police Department and FCA.[60]

**H.   Despite NHTSA's Findings and FCA's Voluntary Recall, FCA Blames Drivers and Fails to Provide a Remedy within a Reasonable Time**

123.   Although FCA has long known about the Defective Shifter, the Company failed to provide a remedy or replace the Defective Shifter within a reasonable time, and did not inform Plaintiffs and members of the Classes that a purported remedy was available until after the highly-publicized death of Mr. Yelchin in June 2016.  Rather, the first recall notice letter sent to Plaintiffs and members of the Classes in May 2016 informed them that they would be notified once FCA developed a remedy for the Defective Shifter.  Even after the June 2016

---

[59] *Id.*

[60] *Id.*

recall was issued, FCA did not have an immediate fix for all of the affected vehicles, and thousands of Class Vehicles have yet to be effectively repaired.

### 1.    The Class Vehicles Are Recalled

124.    On April 22, 2016, FCA announced a voluntary recall of more than 1.1 million Class Vehicles worldwide, including an estimated 811,586 Class Vehicles sold or leased in the United States.  In connection with the recall, FCA issued a press release, stating that "[a]n investigation by FCA US and the National Highway Traffic Safety Administration found some drivers have exited their vehicles without first selecting 'PARK.'"[61]  The Recall Press Release categorized such behavior as a "safety risk" in light of the failure of the Defective Shifter's warning chimes and alert messages inability to deter "some drivers from exiting their vehicles without selecting 'PARK.'"[62]

125.    Thus, FCA announced that it "will enhance the warnings and transmission-shift strategy" on Class Vehicles.[63]  Specifically, "enhancements will combine warnings with a transmission-shift strategy to automatically prevent a vehicle from moving, under certain circumstances, even if the driver fails to select 'PARK.'"[64]    The Recall Press Release failed to include a timeline for the

---

[61] Exhibit C (Recall Press Release).

[62] *Id.*

[63] *Id.*

[64] *Id.*

"enhancements," vaguely stating that "[a]ffected customers will be notified when service becomes available."[65]

126.   At the time of FCA's Recall Press Release, NHTSA stated that its "investigation of the shifter in these vehicles showed it is clearly a safety issue that has led to hundreds of crashes and dozens of injuries."[66]

127.   On or around May 14, 2016, FCA sent Class Vehicle owners and lessees a recall letter, informing them of the Defective Shifter and associated safety risks, including the potential for dangerous rollaways.[67]   The Recall Letter was bare on specifics as to FCA's planned remedy and when lessees and owners of Class Vehicles could expect their vehicles to be repaired.  Specifically, the Recall Letter stated that "a permanent remedy is . . . currently under development" and "FCA is working to finalize a remedy by the 4th quarter of 2016."[68]   Furthermore, the Recall Letter informed owners and lessees that FCA would contact them again by mail "**with a follow-up recall notice, when the remedy is available**."[69]

---

[65] *Id.*

[66] Exhibit W, David Shepardson, *Fiat Chrysler recalls 1.1 million cars, SUVs for rollaway issue*, REUTERS (Apr. 22, 2016), http://www.reuters.com/article/us-fiatchrysler-recall-idUSKCN0XJ2I0 ("April 2016 Reuters Article").

[67] *See* Exhibit D (May 2016 FCA Recall Letter).

[68] *Id.*

[69] *Id.* (emphasis in original).

128.   Notably, FCA limited the scope of its recall to address only the risk of rollaway incidents when a driver exits a vehicle, and did not expand the recall to address the general safety issue posed by the Defective Shifter in that a driver cannot rely on the Defective Shifter to effectively switch to the desired gear and/or the driver does not know which gear the Defective Shifter is in.

## 2.   FCA Failed to Provide a Remedy Within a Reasonable Time

129.   According to NHTSA, "FCA's recall remedy involves the development of revised control logic to provide 'Auto Park' shift strategies."[70] Specifically, NHTSA detailed three scenarios in which the Defective Shifter leads to accidents or injuries and the countermeasures proposed by FCA to remedy each issue related to the defect:

- **<u>Scenario 1</u>**: "Driver believes they put the vehicle in Park and attempts to shutoff the vehicle using the ignition On/Off button, and then exits the vehicle without realizing that the vehicle is not in Park and the engine continues to run."[71]  In response to Scenario 1, FCA developed the following countermeasure: "Automatically shift to Park and shut the engine off when

---

[70] Exhibit B (NHTSA-ODI Resume 2).

[71] *Id.*

73

the vehicle speed is 1.2 mph or less and the ignition On/Off button is pressed."[72]

- **Scenario 2**:  "Driver believes the vehicle is in Park, intentionally leaves the vehicle running and attempts to exit the vehicle."[73]  In response to Scenario 2, FCA developed the following countermeasure: "Automatically shift to Park if the transmission is not in Park, the vehicle speed is 1.2 mph or less, the driver's seat belt is unbuckled, the driver's door is ajar and the brake pedal is not depressed."[74]

- **Scenario 3**: "Driver attempts to shift into Park when the vehicle is moving, but the vehicle speed is too high to engage Park.  The vehicle may default to Neutral in this situation.  The EVIC displays a message 'Vehicle Speed is too high to shift.'"[75]   In response to Scenario 3, FCA developed the following countermeasure: "Automatically shift to Park if vehicle speed drops to 1.2 mph or less within 5 seconds of the attempted shift to Park."[76]

130.   However, it was not until June 24, 2016, that FCA issued a follow-up recall notice to owners and lessees of certain models of Jeep Grand Cherokees

---

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

explaining that the Company had developed a purported remedy for the Defective Shifter.[77]  According to FCA, the remedy would involve taking the vehicle to an FCA dealer, who would "install new software to include an 'Auto Park' feature which eliminates the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle."[78]  The letter also stated that the dealer would provide additional information and guidance regarding the new feature, stating:

> You will receive an "Auto Park" addendum card explaining the vehicle's new "Auto Park" feature.  After your vehicle receives the software update, please review the addendum card with all of the drivers of your vehicle and then store the addendum card in the owner's manual for future reference. Your dealer will also review/demonstrate this new "Auto Park" feature and answer any questions or concerns.[79]

### 3.    FCA Wrongly Blamed Drivers for Rollaway Incidents While it Delayed its Response

131.   Despite NHTSA's findings that the Defective Shifter contained a defect, violates basic design guidelines, and does not adequately inform drivers of the Class Vehicles' gear positions, from first receiving customer complaints and accident reports in 2014 throughout much of 2016, FCA continued to maintain that the accidents associated with the Defective Shifter were the fault of drivers.  In its

---

[77] *See* Exhibit H (June 2016 FCA Second Recall Notice).

[78] *See id.*

[79] *See id.*

Recall Press Release, FCA dismissed allegations of a defect, stating "[t]he vehicles involved in these events were inspected and no evidence of equipment failure was found."[80]   The automaker explained its decision to recall the vehicles was "to reduce the effect of potential driver error by enhancing warnings and transmission shift strategy" and "address customer-satisfaction issues."[81]

132.   FCA further concealed the design defect in its press release by blaming drivers of Class Vehicles for the incidents.   The Company emphasized, "**unless due care is taken**, drivers may draw erroneous conclusions about the status of their vehicles.   The vehicles also deliver warning chimes and alert messages if their driver-side doors are opened while their engines are still running and 'PARK' is not engaged.   However, investigation suggested these measures may be insufficient to deter some drivers from exiting their vehicles without selecting 'PARK.'"[82]

133.   The manufacturer of the Defective Shifter, ZF, maintained that it is not responsible for the defect, instead placing responsibility squarely on FCA for its integration of the ZF shifter into its cars without a safety override, stating:

> ZF supplies gearshift systems to automotive manufacturers according to their technical and design specifications. The manufacturer designs the integration of the gearshift system

---

[80] Exhibit C (Recall Press Release).

[81] *Id.*

[82] *Id.*

into the vehicle operating concept and develops the respective safeguard mechanisms. ZF delivered a fully functional state-of-the-art product, ***which was integrated into the vehicle architecture by [FCA]***.[83]

134.   Consumer safety and advocacy groups noted FCA's continued refusal to accept responsibility for the Defective Shifter and continued attempts to blame Class Vehicle drivers for the safety risk associated with the Defective Shifter. Safety Research & Strategies, a consumer watchdog group, said Defendant has placed blame on drivers, and "[w]hat FCA doesn't acknowledge is their design defect that changes the way a traditional shift lever works and provides inadequate feedback to drivers."[84]

135.   FCA's foot-dragging with respect to notifying its customers of the dangerous Defective Shifter, and taking steps to correct it, is unfortunately business as usual for FCA.  As reported by *The New York Times* on June 21, 2016, Center for Auto Safety Executive Director Clarence Ditlow believes FCA's investigation and recall have taken too long, noting "[t]here was no sense of

---

[83] Exhibit X, David Tracy, *Fiat Chrysler Recalls 1.1 Million Cars Because People Can't Figure Out the Shifters (Update),* Jalopnik (Apr. 22, 2016, 4:25 p.m.), http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 ("2016 Jalopnik Article").

[84] Exhibit Y, Brent Snavely, *Jeep recall in spotlight after actor Anton Yelchin's death*, DETROIT FREE PRESS (June 20, 2016), http://www.freep.com/story/money/cars/chrysler/2016/06/20/jeep-recall-spotlight-after-actor-anton-yelchins-death/86140930/ ("June 2016 Detroit Free Press Article").

urgency on Chrysler's part or N.H.T.S.A.'s part given the potential for death or injury."[85]

136.    This is not the first time Defendant has been criticized for dragging its feet with regard to vehicle safety recalls.  NHTSA has "publicly chastised [FCA], which acknowledged delaying recalls in almost two dozen cases going back to 2013 and affecting millions of vehicles."[86]   NHTSA head, Mark Rosekind, had voiced the agency's "concerns about slow completion rates, slow or inadequate notifications to consumer, faulty remedies, improper actions by dealers any more"[87] related to 20 separate recalls that affected 10 million vehicles.   Mr. Rosekind further stated that FCA's conduct at that time "represent[ed] a significant failure to meet a manufacturer's safety responsibilities."[88]   In response, FCA promised to speed up its recalls and agreed to pay penalties of as much as $105 million.  As described by FCA, "[i]n 2015, FCA US continued to focus efforts on refining recall processes and procedures and entered into a consent order with the National Highway Traffic Safety Administration (NHTSA) to undertake specific

---

[85] Exhibit V (2016 New York Times Article).

[86] *Id.*

[87] Exhibit Z, Brett Snavely, *NHTSA Questions FCA recall response rate in 20 recalls,* DETROIT FREE PRESS (May 18, 2015), http://www.freep.com/story/money/cars/chrysler/2015/05/18/fca-fiat-chrysler-jeep-recalls-nhtsa-pubic-hearing/27531875/ ("May 2015 Detroit Free Press Article").

[88] *Id.*

actions to improve its recall execution."[89]  Mr. Ditlow stated that the consent order was "totally aimed at making Chrysler do a better job on recalls in the future."[90]

137.   But this case evidences the fact that little has changed.  FCA is still putting profits ahead of safety.  Defendant has known of the safety risks associated with the Defective Shifter since shortly after the Class Vehicles entered the market and at least since August 2015 when NHTSA opened its investigation.  As framed by *The New York Times*, "[t]he question is why, nearly a year later, Fiat Chrysler has still not come up with a fix for the problem, which has now been linked to hundreds of accidents, dozens of injuries and now—potentially—a well-publicized death."[91]

138.   Indeed, on December 16, 2016, NHTSA announced a related investigation into rollaways associated with additional FCA vehicles, including model year 2013-2016 Dodge Ram 1500s and model year 2014-2016 Dodge Durangos with an electronically shifted transmission and electronic rotary control for driver gear selections.[92]   NHTSA's ODI described the issue as identical to the issue with the Class Vehicles, stating that "[c]ustomers report incidents of vehicle roll-way after the operator allegedly shifted the transmission to Park and exited the

---

[89] Exhibit L (2015 Sustainability Report).

[90] Exhibit W (2016 New York Times Article).

[91] *Id.*

[92] *See* Exhibit AA (NHTSA-ODI Resume 3).

vehicle."[93]   NHTSA estimates that 1,000,000 additional vehicles are affected by the most recent investigation.[94]

139.  ODI summarized the most recent FCA investigation, PE 16-014, as follows:

> The Office of Defects Investigation (ODI) has identified 43 complaints alleging vehicle roll-away from a parked position in model year (MY) 2013-2016 Ram 1500 and MY 2014-2016 Dodge Durango. These subject vehicles are equipped with an electronically shifted transmission and electronic rotary control for driver gear selections. The reports alleged that the unintended motion occurred after the driver moved the transmission gear selector to Park and exited the vehicle. Nine injuries have been alleged in eight reports, 25 crashes are alleged. Thirty-four of the reports alleged that the vehicle was moving while the shifter indicated that it was in the park position. Many of the incidents alleged the engine was running, however it was noted as off in a few cases.[95]

**I.     FCA Finally Provides a Purported Remedy for Certain Class Vehicles: One that is Ineffective and Diminishes the Functionality of the Class Vehicles.**

140.  After its prolonged and unreasonable delay, FCA responded to the Defective Shifter maelstrom by providing a purported remedy that: (1) is ineffective and/or causes rollaways of Class Vehicles; (2) leads to other

---

[93] *Id.*

[94] *See id.*

[95] *Id.*

mechanical failures in the Class Vehicles; and/or (3) diminishes the functionality of the Class Vehicles.

### 1.    FCA's Purported Remedy Is Ineffective

141.   Numerous Class members have reported that they never received a recall notice from FCA, and have yet to be contacted by the Company or offered the purported remedy for the Defective Shifter in their Class Vehicles.

142.   Moreover, many of those who have had their Class Vehicle repaired by FCA report that the repair was ineffective such that the vehicles continue to experience rollaway incidents (or experienced a rollaway for the first time after the repair) or incidents where their vehicle is not in the intended gear.

143.   On information and belief, dealerships have reported that the first recall remedy was ineffective, many of the Class Vehicles have had to be fixed more than once, and even FCA's own dealers are unsure whether the second recall remedy will effectively fix the Defective Shifter, thus requiring Plaintiffs and members of the Classes to devote even more time to remedying this defect.

144.   FCA already has admitted that at least 13,000 Class Vehicles in the United States have not been properly fixed even though they were recalled and repaired by the Company.[96]  According to a November 16, 2016 *Associated Press* article: "The new software was supposed to make the cars and SUVs automatically

---

[96]*See* Exhibit I (November 2016 Associated Press Article).

shift into park when the driver's door is opened while the engine is running.  But Fiat Chrysler says the change didn't properly fix 13,000 vehicles in the U.S. and 16,000 in other countries."[97]

145.  FCA spokesman Eric Mayne stated: "The software didn't work in a small number of vehicles with certain engine, transmission and two- or four-wheel-drive combinations . . . In most cases we initiated the installation of that software without the customer having to show up with the recall notice in hand. It just wasn't the right software for their particular vehicles."[98]  Thus, certain Class members have experienced dangerous rollaway incidents after their Class vehicles were repaired, have incurred out-of-pocket costs associated with damage to property and personal injuries, and have incurred insurance deductible and increased premium expenses.  In addition, these Class members will have to take additional time off from work and/or their daily activities to take their Class Vehicles to a dealership for additional repairs.

146.  FCA sent certain Class members a notice of need for additional repairs, informing them of the need to take their Class Vehicle to the dealership to

---

[97] *Id.*

[98] *Id.*

be fixed for a second time, thus causing additional time to be spent attempting to remedy the defect.[99]  The notice of need for additional repairs states:

> Our records indicate that the recall repairs were attempted on your vehicle at a FCA US dealer.   Further investigation by FCA US has determined, however, that **your vehicle <u>did not</u> receive the complete and proper recall repair.   Your vehicle's software requires additional updating**. . . . **Until the complete recall repair is performed on your vehicle, your vehicle may roll away striking and injuring you, your passengers, or bystanders, if the vehicle's engine is left running, the parking brake is not engaged and the vehicle is not in the "PARK" position before exiting the vehicle.**"[100]

## 2.   FCA's Purported Remedy Has Led to Other Mechanical Failures in Class Vehicles

147.   Class members also report that FCA's purported remedy led to other mechanical failures in their Class Vehicles.   These mechanical failures occurred shortly after the software update was performed on the Class Vehicles.

148.   Below is a sample of complaints lodged with NHTSA as a result of FCA's purported remedy:

**NHTSA Complaints Related to the Ineffective Remedy**

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 07/05/2016
**Date of Incident:** 07/03/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10882724

---

[99] *See* Exhibit J ("Notice of Need For Additional Repairs").

**[100] *Id.* (emphasis in original).**

TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. AFTER THE VEHICLE WAS BEING REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), THE GEAR SHIFTER FAILED TO SHIFT FROM THE PARK POSITION WHEN ATTEMPTING TO REVERSE. THE FAILURE RECURRED NUMEROUS TIMES AND IN VARIOUS POSITIONS. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 28,000.

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 07/25/2016
**Date of Incident:** 06/30/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10888330
TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. THE CONTACT HAD NOT EXPERIENCED A FAILURE PRIOR TO BEING REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT INDICATED THAT THE REMEDY DID NOT PROVIDE A REPAIR SOLUTION. THE GEAR SELECTOR RANDOMLY CHANGED GEARS MORE THAN ONCE WITHOUT WARNING. THE FIRST TIME THE FAILURE OCCURRED WHILE REVERSING THE VEHICLE AND THE GEAR RANDOMLY SHIFTED INTO PARK AND WAS UNABLE TO SHIFT MOMENTARILY. THE DEALER WAS NOTIFIED AND WAS TO SEND A TOW TRUCK, BUT IT DID NOT ARRIVE IN A REASONABLE TIME FRAME. THE CONTACT WAS ABLE TO MANEUVER THE GEAR SHIFT FROM PARK TO DRIVE AND TOOK THE VEHICLE TO THE DEALER. THE DEALER WAS UNABLE TO REPLICATE AND DIAGNOSE THE FAILURE. THE FAILURE RECURRED. THE CONTACT WAS IN THE PROCESS OF MAKING A LEFT TURN WHILE IN DRIVE WHEN THE GEAR SELECTOR CHANGED INTO PARK. THE VEHICLE WAS UNABLE TO BE DRIVEN AND WAS TOWED TO A DEALER. THE CONTACT WAS WAITING ON A RESPONSE FROM THE MANUFACTURER TO SEE IF THEY COULD SEND A TECHNICIAN TO DIAGNOSE THE VEHICLE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS NOT AVAILABLE.

**2015 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/08/2016
**Date of Incident:** 08/06/2016
**Component(s):** UNKNOWN OR OTHER
**NHTSA ID Number:** 10893897

JEEP WENT IN FOR SERVICE TO CORRECT THE RECALLED TRANSMISSION ELECTRONIC SHIFT LEVER ON SATURDAY, AUG. 6TH AT 12:30PM. PICKED UP CAR FROM FARRISH JEEP AT 5PM SAME DAY. AT 8PM ON THE SAME DAY, THE CAR WOULD NOT GO OUT OF PARK, THOUGH THE SHIFT LEVER WAS IN DRIVE WHILE IN MY DRIVEWAY. THE DASHBOARD DISPLAYED PARK, WHILE SHIFTER WAS IN DRIVE. EXACT THING HAPPENED WITH 2010 JEEP WRANGLER IN MAY, 2015 AND FARRISH CLAIMED TO FIX IT 3 TIMES IN 36 HOURS. IT HAD TO BE TOWED 3 TIMES BY THE DEALER, BECAUSE THE CAR ROLLED AWAY FROM MY TEENAGE DRIVER THE SAME DAY WE GOT IT BACK FROM FARRISH(IN A NEIGHBORHOOD) AFTER THEY CLAIMED TO HAVE FIXED IT. THIS HAPPENED 3 TIMES IN 36 HOURS.

**2014 Chrysler 300**
**Date Complaint Filed:** 08/08/2016
**Date of Incident:** 07/05/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10893928
TL* THE CONTACT OWNS A 2014 CHRYSLER 300. THE CONTACT HAD NOT EXPERIENCED A FAILURE PRIOR TO THE VEHICLE BEING REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT STATED THAT THE VEHICLE INDEPENDENTLY SHIFTED INTO NEUTRAL FROM PARK SEVERAL TIMES WITHOUT WARNING. THE DEALER WAS NOTIFIED OF THE FAILURE AND PROVIDED NO SOLUTION. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS NOT AVAILABLE. UPDATED 10/04/16*LJ

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/12/2016
**Date of Incident:** 08/07/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10895432
TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. WHILE THE VEHICLE WAS IN NEUTRAL AT A CAR WASH, THE CONTACT RELEASED THE BRAKE PEDAL AND OPENED THE DOOR. INDEPENDENTLY, THE GEAR SHIFTER SHIFTED FROM NEUTRAL TO PARK. THE VEHICLE WAS PREVIOUSLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE

MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 29,000

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/14/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN , UNKNOWN OR OTHER
**NHTSA ID Number:** 10895811
MY JEEP WAS SERVICED TWICE FOR THE RECENT SHIFTER PROBLEM THAT CHRYSLER IDENTIFIES AS DRIVER INATTENTION OR CONFUSION. THE SOFTWARE PATCH THAT IS INTENDED TO "AUTO PARK" THE VEHICLE, HAS FAILED ON TWO OCCASIONS. THE ENGINE IS STARTED, I APPLY THE BRAKE AND PLACE THE SHIFTER INTO REVERSE OR A FORWARD GEAR. I THE DESIRED GEAR IS ILLUMINATED AND I EASE OF THE BRAKE, HOWEVER, WHEN APPLY GAS THE ENGINE SIMPLY RACES AS IF THE TRANSMISSION IS STILL IN PARK OR NEUTRAL. JEEPS ATTEMPT TO FIX A PROBLEM HAS NOW LED TO ANOTHER PROBLEM. THIS VEHICLE IS UNRELIABLE AND A DEATH MACHINE. I HAVE NO CONFIDENCE IN IT'S OPERATION AND I CAN'T IN GOOD CONSCIENCE SELL THIS VEHICLE TO ANYONE. JEEP CORPORATE SHOULD BE IN JAIL.

**2014 Chrysler 300**
**Date Complaint Filed:** 08/15/2016
**Date of Incident:** 08/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10895959
TL* THE CONTACT OWNS A 2014 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE WAS PREVIOUSLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN); HOWEVER, THE VEHICLE WAS STILL EXPERIENCING THE SAME FAILURE. THE CONTACT STATED THAT THE VEHICLE SLIPPED OUT OF PARK SEVERAL TIMES AFTER BEING REPAIRED. THE CONTACT NOTIFIED THE DEALER, BUT HAD NOT RECEIVED AN ALTERNATIVE REPAIR SOLUTION. THE FAILURE MILEAGE WAS 10,000. UPDATED 10/04/16*LJ

**2015 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/19/2016
**Date of Incident:** 06/13/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10897115

TL* THE CONTACT OWNS A 2015 JEEP GRAND CHEROKEE. THE CONTACT HAD NOT EXPERIENCED ANY FAILURES BEFORE THE DEALER COMPLETED A SOFTWARE UPDATE PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). WHILE THE VEHICLE WAS PARKED, THE GEAR SHIFTED OUT OF POSITION. THE VEHICLE LUNGED FORWARD AT A HIGH RATE OF SPEED AND CRASHED INTO A WOODEN STRUCTURE. THERE WERE NO INJURIES AND A POLICE REPORT WAS NOT FILED. THE CONTACT WAS ABLE TO RE-ENTER THE VEHICLE TO ENSURE THE VEHICLE WAS PLACED IN PARK. THE DEALER WAS UNABLE TO REPLICATE AND DIAGNOSE THE FAILURE. THE VEHICLE WAS NOT REPAIRED, BUT THE STRUCTURAL DAMAGES WERE TO BE ADDRESSED BY THE INSURANCE COMPANY. THE VIN WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT WAS UNABLE TO DETERMINE WHEN THE FAILURE WOULD RECUR. THE MANUFACTURER PROVIDED NO SOLUTION. THE VIN WAS INVALID. THE FAILURE MILEAGE WAS NOT AVAILABLE. UPDATED 11/17/16*LJ

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/24/2016
**Date of Incident:** 08/16/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898220
I DRIVE THE 2014 GR CHEROKEE WITH THE ELECTRONIC GEAR SHIFTER THAT HAS BEEN RECALLED FOR THE SHIFTER NOT ENGAGING ALL OF THE WAY INTO PARK. I HAD THE RECALL 'FIX' DONE A COUPLE OF MONTHS AGO, BUT THEN FOUND OUT FROM THE DEALER THAT THE EMERGENCY BRAKE ONLY ENGAGES IF YOU ATTEMPT TO OPEN ONE OF THE DOORS. ABOUT A WEEK AGO, AFTER PARALLEL PARKING ON A BUSY CITY STREET, I PUT THE CAR IN PARK AND REMAINED IN THE CAR FOR ABOUT ANOTHER MINUTE WHILE FISHING QUARTERS OUT OF MY CUPHOLDER (FOR THE PARKING METER). I ALL OF A SUDDEN FELT LIKE SOMETHING HIT MY CAR, LOOKED UP ONLY TO FIND MY CAR HAD ROLLED BACKWARD INTO THE PARKED CAR BEHIND ME. I HAVE A HUGE BIKE RACK ON THE BACK OF MY JEEP THAT BLOCKS THE REVERSE CAMERA, SO THE AUDIBLE SECURITY ALERT IS ALWAYS ON WHEN THE CAR IS IN REVERSE - THIS ALERT DID NOT COME ON WHILE THE CAR WAS ROLLING BACKWARD, THEREFORE, THE CAR WAS NOT IN REVERSE, BUT RATHER NOT IN PARK ALL OF THE WAY. THANKFULLY THERE

WERE NO PEDESTRIANS BEHIND MY CAR, NOR ANY DAMAGE TO EITHER VEHICLE, HOWEVER, IF A PERSON WOULD HAVE HAD THEIR BACK TO ME, I WOULD HAVE CRUSHED THEM BETWEEN THE TWO CARS. MY CAR HAS NOW BEEN AT THE DEALERSHIP FOR 6 DAYS (SECOND TIME FOR SAME ISSUE) AND I'M DEALING WITH CUSTOMER SERVICE DEPARTMENTS WITHIN CHRYSLER/JEEP TO RECTIFY THIS ISSUE SOMEHOW. I WANT EITHER A NEW GEAR SHIFTER THAT IS NOT ELECTRONIC, OR TO GET OUT OF THIS VEHICLE. THIS GEAR SHIFTER IS AN ENORMOUS SAFETY HAZARD. I FEEL LIKE I'M GETTING THE RUN-AROUND, TO SAY THE LEAST, ABOUT A MAJOR RECALL THAT IS THE AUTO MAKERS FAULT, NOT THE CONSUMER. FOR THE RECORD, I HAVE BEEN DRIVING APPROXIMATELY 30 YEARS AND TYPICALLY AVERAGE 20-30K MILES/YEAR. I AM CONSULTING A LAWYER AT THIS POINT.

**2015 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/25/2016
**Date of Incident:** 08/18/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898445
NHTSA ID NUMBER: 10894308 THIS SAME ISSUE HAPPENED TO OUR 2015 GRAND CHEROKEE AFTER THE SOFTWARE SAFETY RECALL OF THE TRANSMISSION CONTROL LEVER. PROCEEDING IN DRIVE ON A HIGHWAY, THE LEVER WAS GENTLY BRUSHED - NOT HIT HARD - AND THE TRANSMISSION WENT INTO NEUTRAL. THE THUMB BUTTON WAS NOT DEPRESSED. THIS IS A SIGNIFICANT SAFETY ISSUE, AND WE DID NOT EXPERIENCE IT PRIOR TO THE SOFTWARE UPDATE. IT HAS NOW BEEN REPLICATED SEVERAL TIMES, AND A VIDEO CAN BE PROVIDED IF NECESSARY.

**2013 Chrysler 300**
**Date Complaint Filed:** 09/08/2016
**Date of Incident:** 08/25/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10904633
TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE FAILED TO SHIFT OUT OF PARK. THE VEHICLE WAS SERVICED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE CONTACT MENTIONED THAT THE FAILURE OCCURRED ON THE

SAME DAY SHORTLY AFTER THE RECALL REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

**2012 Chrysler 300**
**Date Complaint Filed:** 10/04/2016
**Date of Incident:** 10/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10913784
TL* THE CONTACT OWNS A 2012 CHRYSLER 300. AFTER ATTEMPTING TO PLACE THE VEHICLE IN PARK AND EXIT, THE CONTACT DISCOVERED THAT THE GEAR SHIFT FAILED TO MOVE INTO THE PARK POSITION AND THE ACCESSORY WARNING INDICATOR ILLUMINATED. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE VEHICLE WAS DIAGNOSED A SECOND TIME AND THE TECHNICIAN STATED THAT THE RECEIVING CODE FOR THE TRANSMISSION WAS NOT UPDATED TO THE COMPUTER. THE VEHICLE WAS NOT REPAIRED DUE TO THE PART BEING ON BACK ORDER. THE CONTACT MENTIONED THAT THE ACCESSORY INDICATOR REMAINED ILLUMINATED AFTER THE RECALL REPAIR. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 57,000.

**2012 Chrysler 300**
**Date Complaint Filed:** 10/13/2016
**Date of Incident:** 10/05/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10915745
TL* THE CONTACT OWNS A 2012 CHRYSLER 300. AFTER THE VEHICLE WAS REFUELED, IT WAS UNABLE TO BE STARTED. THE VEHICLE WAS TOWED TO THE DEALER WHERE IT WAS DETERMINED THAT THE VEHICLE WAS NOT IN THE PARK POSITION. THE VEHICLE WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE VEHICLE WAS REPAIRED PER THE RECALL; HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 80,000.

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 10/19/2016

**Date of Incident:** 04/23/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10917281
TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. THE CONTACT STATED THAT WHILE REVERSING FROM A PARKING SPACE AND THEN PLACING THE GEAR SHIFTER INTO THE DRIVE POSITION, THE GEAR SHIFTER MOVED TO THE PARK POSITION INDEPENDENTLY. THE FAILURE OCCURRED MULTIPLE TIMES. THE CONTACT STATED THAT THE VIN WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN) AND WAS REPAIRED HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOT NOTIFIED ABOUT THE FAILURE. THE APPROXIMATE MILEAGE WAS 36,000. THE VIN WAS NOT AVAILABLE.

## NHTSA Complaints Related to Mechanical Failures

**2012 Dodge Charger**
**Date Complaint Filed:** 08/23/2016
**Date of Incident:** 08/16/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10897869
TL* THE CONTACT OWNS A 2012 DODGE CHARGER. THE CONTACT STATED THAT THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS REMEDIED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). ATER LEAVING THE DEALER, THE CHECK ENGINE AND TRANSMISSION WARNING INDICATORS ILLUMINATED. THE VEHICLE COULD NOT BE DRIVEN OVER 20 MPH. THE VEHICLE WAS TAKEN BACK TO THE DEALER, BUT THE DIAGNOSIS WAS UNKNOWN. THE MANUFACTURER WAS NOTIFIED OF THE ISSUE. THE FAILURE MILEAGE WAS APPROXIMATELY 30,000.

**2013 Chrysler 300**
**Date Complaint Filed:** 08/24/2016
**Date of Incident:** 08/17/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898152
TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT INDICATED THAT THERE HAD BEEN NO FAILURES UNTIL THE VEHICLE WAS TAKEN TO THE DEALER TO BE REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). SHORTLY AFTER

LEAVING THE DEALER, THE ACCELERATOR PEDAL WAS APPLIED AND DID NOT RESPOND MORE THAN ONCE. THE CONTACT HAD TO APPLY FORCE TO THE ACCELERATOR PEDAL WHILE DRIVING 40 MPH. WHEN DRIVING OVER A RAILROAD TRACK, THE CONTACT HAD TO APPLY FORCE TO THE ACCELERATOR PEDAL TO GET THE VEHICLE TO CROSS THE TRACKS. THE TRANSMISSION WARNING INDICATOR FLASHED. IN ADDITION, THE CONTACT WAS ABLE TO COAST THE VEHICLE OVER TO THE SIDE OF THE ROAD. THE VEHICLE WAS UNABLE TO BE DRIVEN DUE TO THE FAILURE. THE VEHICLE WAS TOWED TO THE DEALER, BUT THEY DID NOT HAVE A REPAIR SOLUTION OR PARTS AVAILABLE. THE MANUFACTURER WAS CONTACTED MORE THAN TEN TIMES BY THE CONTACT AND WAS STILL WAITING ON A REPAIR REMEDY TO DETERMINE IF THE VEHICLE WOULD BE REPAIRED. THE VIN WAS NOT AVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 18,000. UPDATED 10/06/16*LJ

**2013 Dodge Charger**
**Date Complaint Filed:** 09/20/2016
**Date of Incident:** 08/12/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10908275
TL* THE CONTACT OWNS A 2013 DODGE CHARGER. THE CONTACT RECEIVED A RECALL NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT TOOK THE VEHICLE TO THE DEALER. WHEN THE DEALER TRIED TO REPLACE THE PART, THE TRANSMISSION CONTROL MODULE CRASHED AND THE ENGINE STALLED. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 17,000.

**2012 Dodge Charger**
**Date Complaint Filed:** 10/03/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10911109
TL* THE CONTACT OWNS A 2012 DODGE CHARGER. AFTER THE VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), THE CONTACT BEGAN TO EXPERIENCE A FAILURE. THE CONTACT STATED THAT THE SHIFTER FAILED TO LOCK INTO THE DESIRED POSITION. THE CONTACT HEARD A LOUD CLONKING

NOISE COMING FROM THE TRANSMISSION. THE DEALER DIAGNOSED
THAT THE REPAIR CAUSED THE TRANSMISSION TO FAIL. THE
CONTACT WAS UNSURE OF THE DETAILS OF THE REPAIR. THE
VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE
AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

**2013 Chrysler 300**
**Date Complaint Filed:** 11/18/2016
**Date of Incident:** 07/18/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10926948
TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT HAD
NOT EXPERIENCED ANY FAILURES PRIOR TO BEING REPAIRED PER
NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). SHORTLY
AFTER THE DEALER'S REPAIR, THE VEHICLE DRASTICALLY REDUCED
SPEED WITHOUT WARNING. THE TRANSMISSION GEARS WOULD NOT
REMAIN IN THE GEAR THAT WAS SELECTED. THE VEHICLE WAS
TAKEN BACK TO THE DEALER, BUT THE FAILURE COULD NOT BE
DUPLICATED. THE DEALER INDICATED THAT MORE THAN ONE
TECHNICIAN MAY NEED TO DO FURTHER DIAGNOSTIC TESTING. THE
MANUFACTURER WAS NOTIFIED. THE FAILURE MILEAGE WAS NOT
AVAILABLE.

### 3.    FCA's Purported Remedy Diminishes the Functionality of the Class Vehicles

149.   Moreover, when effective, the remedy diminishes the functionality of

the Class Vehicles.  When a driver of a Class Vehicle opens the driver-side door

but the car is not in Park, the software fix abruptly places the vehicle in Park even

if the driver is not exiting the vehicle, thereby jerking the driver and the vehicle

into the Park position.

150.   In addition, many Class members purchased or leased their Jeep

Grand Cherokees in order to tow cargo.  In fact, FCA advertises the Jeep Grand

Cherokee as having **Best-in-Class Maximum Towing Capacity**, stating: "Grand Cherokee can tow a Best-in-Class maximum towing capacity of up to 7,400 pounds."[101]   This functionality has been diminished by FCA's purported remedy which prevents Class Vehicle owners and lessees from opening the door to visibly check their tow cargo while driving in reverse.   When Class Vehicle drivers attempt this standard practice used while towing cargo, their repaired Class Vehicles abruptly jump into Park, thereby destroying the vehicles' towing feature touted by FCA.

### 4.   Plaintiffs and Class Members Were Harmed by the Recall While Defendant Benefited

151.   Plaintiffs and members of the Classes were harmed by the Defective Shifter and recall in a number of ways, in that they, inter alia: (1) did not receive the benefit of the bargain of the purchase or lease of the Class Vehicles which were sold and leased as safe and reliable vehicles at premium prices even though they contained a known but concealed defect; (2) were forced to take time off from work and/or their daily activities in order to have the repair implemented (in some cases more than once); (3) own or lease a repaired vehicle which suffers from continued rollaways or other mechanical failures; (4) own or lease a repaired vehicle with diminished functionality due to the remedy instituted by FCA; and/or

---

[101] Exhibit BB, *Jeep, Trail Rated Tough*, http://www.jeep.com/en/2016/grand-cherokee/capability/ (last visited Dec. 16, 2016) ("Jeep Trail Rated Screenshot").

(5) own a vehicle that has substantially diminished in value and is diminishing in value at an increased

152.   Defendant benefited and was unjustly enriched as a result of the recall, which forced hundreds of thousands of customers to visit its dealerships nationwide—without the need for FCA to spend millions of dollars on advertising and marketing to drive customers to its dealerships.   As explained by an automotive industry consultant in a recent *Los Angeles Times* article: "Recalls are definitely good for business. Smart dealers actively market recalls by calling up customers."[102]

153.   An article in *Digital Dealer* provided dealers with the following advice regarding recalls: "Typically, you must be spending a lot of time, money and effort on bringing more traffic to your lot. But with recalls so abundant, you surely get more people without moving a finger – people come to get their cars fixed."[103]   According to the article, "a Chrysler estimate during one of its recalls showed that 15 percent of their new car purchases came thanks to the service department," and "GM managed to sell 6,600 (in one week) during the ignition

---

[102] Exhibit CC, Jerry Hirsch, *GM recalls are windfall for dealers; The automaker is paying them to fix problems on up to 6 million vehicles,* L.A. TIMES, Apr. 24, 2014, at B1 ("2014 L.A. Times Article").

[103] Exhibit DD, *How Auto Dealers Can Boost Profits Amid the Recalls,* DIGITAL DEALER (Aug. 15, 2014), http://www.digitaldealer.com/how-auto-dealers-can-boost-profits-amid-the-recalls/ ("2014 Digital Dealer Article").

switch recall."[104]   Indeed, one Dallas-based dealer reported that, during the Ford recall, he "had the largest profit month of [his] career as a dealership owner."[105]

### J.   FCA's Delayed and Inadequate Response to the Defective Shifter Deprived Class Members of the Benefit of their Bargain and Has Led to a Decrease in Value of the Class Vehicles

154.   Plaintiffs and Class members purchased or leased Class Vehicles based upon a reasonable assumption and based on Defendant's warranties that the vehicles were safe and free of defects.  However, the Class Vehicles delivered by Defendant were not those for which Plaintiffs and Class members bargained. Rather, the Class Vehicles suffered from a common defect—the Defective Shifter. Had Plaintiffs and Class members known of the defect, they would have either (1) paid substantially less for the vehicles; (2) required an immediate remedy that restored the vehicles to the conditions bargained for; or (3) not purchased or leased the Class Vehicles.

155.   As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and Class members suffered economic harm.  This economic harm can be quantified as: (1) the economic value of an effective remedy that restores vehicles to their expected conditions (or the economic harm from the lack of that remedy); (2) the discount

---

[104] *Id.*

[105] *Id.*

that Plaintiffs and Class members would have required to accept the Class Vehicles in their actual condition; and/or (3) the diminished value experienced by the Class Vehicles upon disclosure of the Defective Shifter.

156.   A successful repair of the Class Vehicles would not fully compensate Plaintiffs and Class members.  Through its concealment of the Defective Shifter, FCA deprived Plaintiffs and Class members of the value of a fully functional vehicle for at least some portion of ownership.  Furthermore, Plaintiffs and Class members must monitor the status of their Class Vehicles' defects and incur time and expense in order to execute repairs.  Furthermore, prior to an effective repair, FCA has appropriated economic welfare from Plaintiffs and Class members by avoiding or delaying the expense necessary to remedy the Defective Shifter while forcing Plaintiffs and Class members to subsidize them by unknowingly assuming the safety risk associated with driving the Class Vehicles containing the Defective Shifter.

157.   Plaintiffs and Class members paid premiums to purchase the Class Vehicles as a result of the brand, reliability, value, and safety representations made by FCA. A car purchased or leased with the reasonable expectation that it is safe and reliable as advertised is worth more than a car known to be subject to the risk of dangerous rollaway incidents.  Class members were harmed from the day they

drove their Class Vehicle off the lot because they did not get what they paid for—a car that was well-designed and safe to operate.

158.   As a direct result of FCA's misrepresentations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  Plaintiffs and Class members paid a premium for the Class Vehicles which were advertised as safe and reliable, and received Class Vehicles that contained a known but concealed defect.  Defendant was unjustly enriched because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the cars they received in return.

159.   In addition, following the death of actor Anton Yelchin who was crushed by his rollaway 2015 Jeep Grand Cherokee, there has been widespread disclosure of the design defect of the Defective Shifter in the Class Vehicles. This press has caused a sharp decrease in the value of the Class Vehicles and may have made them essentially unsalable. Each Class member therefore suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicle.

160.   The Jeep Grand Cherokee presents a marked example of the diminished value of Class Vehicles.  Prior to widespread knowledge of the dangerous shifter defect, these vehicles held their value *better* than other vehicles in the same class.  But after the market became aware of the defect, the

depreciation rate of 2014-15 Jeep Grand Cherokee vehicles increased dramatically, as shown in the table below:

### Average Monthly Depreciation
### Middle Sport/Utility Segment

| 2014 Model Year | Pre-Period 8/2014-5/2016 | Post-Period 6/2016-10/2016 |
|---|---|---|
| Jeep Grand Cherokee | -1.10% | -1.60% |
| Rest of Class | -1.24% | -1.29% |

| 2015 Model Year | Pre-Period 9/2015-5/2016 | Post-Period 6/2016-10/2016 |
|---|---|---|
| Jeep Grand Cherokee | -1.03% | -1.59% |
| Rest of Class | -1.11% | -1.04% |

161.   What the above table shows is that prior to market knowledge of the shifter defect, Jeep Grand Cherokee vehicles had monthly depreciation rates that were lower than other vehicles in the same class, thus these cars held their value better than competitive cars.   But after the shifter defect became known, the monthly depreciation rates rocketed up for Jeep Grand Cherokees while staying flat, or decreasing for competitors.   The effect of the 0.5% increase in monthly depreciation for the Grand Cherokee is substantial.   For example, on a $40,000

vehicle, the increase means the car depreciates about *$200 more per month*, thus at least $2,400 more in just a single year of ownership.

162.   The loss in value is particularly acute and affects Class members because they do not want to own unsafe cars that might roll away and crush them or members of their family.  Safety, reliability, and quality of design are at the core of FCA's marketing efforts and a driving factor in purchase decisions. Class members want to sell their Class Vehicles but they cannot without incurring substantial losses.  In addition, Class members—unlike FCA—are concerned about selling their Class Vehicles to another driver who may experience a dangerous rollaway incident.

163.   Moreover, many Class members purchased their vehicles with financing in the form of car loans or leases. The drop in value of the Class Vehicles has caused the financing to be underwater, meaning that Class members will have to pay money over and above whatever they can sell their car for.

164.   In addition, many Class members purchased expensive extended warranties for their Class Vehicles, intending to own the vehicles for many years beyond the initial warranty. However, as a result of the Defective Shifter, Class members no longer want to own the Class Vehicles and when they sell them, in addition to losses from the cars being worth much less as a result of the defect, they will lose the value of the extended warranties that they purchased.

165.   As a result of FCA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that the Defective Shifter is unsafe and defectively designed, owners and/or lessees of the Class Vehicles have suffered losses in money and/or property.  Had Plaintiffs and Class members known of the defect at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

### A.   Discovery Rule Tolling

166.   Class members had no way of knowing about FCA's Defective Shifters in their Class Vehicles. As evidenced by its foot-dragging in resolving the issue and implementing a fix, FCA was intent on expressly hiding its behavior from regulators and consumers.  This is the quintessential case for tolling.

167.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that FCA was concealing the design defect complained of herein and misrepresenting the company's true position with respect to the safety qualities of its vehicles.

168.   Within the period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that FCA was concealing the Defective Shifter.

169.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

### B.   Estoppel

170.   FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Defective Shifter in the vehicles at issue.

171.   FCA knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Defective Shifter in the vehicles at issue.

172.   Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

## VI.   CLASS ALLEGATIONS

173.   Plaintiffs bring this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

**Nationwide Class**
All persons or entities who purchased or leased a 2012-14 Dodge Charger, 2012-14 Chrysler 300, or 2014-15 Jeep Grand Cherokee.

**Arizona Subclass**
All members of the Nationwide Class who are residents of Arizona or purchased their Class Vehicle in Arizona.

**Colorado Subclass**
All members of the Nationwide Class who are residents of Colorado or purchased their Class Vehicle in Colorado.

**Georgia Subclass**
All members of the Nationwide Class who are residents of Georgia or purchased their Class Vehicle in Georgia.

**Iowa Subclass**
All members of the Nationwide Class who are residents of Iowa or purchased their Class Vehicle in Iowa.

**Louisiana Subclass**
All members of the Nationwide Class who are residents of Louisiana or purchased their Class Vehicle in Louisiana.

**Maryland Subclass**
All members of the Nationwide Class who are residents of Maryland or purchased their Class Vehicle in Maryland.

**Minnesota Subclass**
All members of the Nationwide Class who are residents of Minnesota or purchased their Class Vehicle in Minnesota.

**North Carolina Subclass**
All members of the Nationwide Class who are residents of North Carolina or purchased their Class Vehicle in North Carolina.

**Oklahoma Subclass**
All members of the Nationwide Class who are residents of Oklahoma or purchased their Class Vehicle in Oklahoma.

**Texas Subclass**
All members of the Nationwide Class who are residents of Texas or purchased their Class Vehicle in Texas.

**Utah Subclass**
All members of the Nationwide Class who are residents of Utah or purchased their Class Vehicle in Utah.

**Wyoming Subclass**
All members of the Nationwide Class who are residents of Wyoming or purchased their Class Vehicle in Wyoming.

174. Excluded from the Class are individuals who have personal injury claims resulting from the defectively designed Defective Shifters in their Class Vehicles.  Also excluded from the Class are FCA, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates, FCA dealers, Class counsel and their employees, and the judicial officers and their immediate family members and associated court staff assigned to this case, all persons who make a timely election to be excluded from the Class, governmental entities, and the judge to whom this case is assigned and his/her immediate family.

175. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-

wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

176.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

177.   <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  There are over 800,000 Class Vehicles that have been sold in the United States.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

178.   <u>Commonality and Predominance</u>.  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

 a. Whether FCA engaged in the conduct alleged herein;

 b. Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

 c. Whether the Defective Shifter system in the Class Vehicles contains a safety defect;

 d. Whether FCA knew about the defect in the Defective Shifter and, if so, how long FCA has known of it;

e.      Whether FCA designed, manufactured, marketed, and distributed the Class Vehicles with a Defective Shifter;

f.      Whether FCA's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

g.      Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

h.      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

i.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

179.   <u>Typicality</u>.   Federal Rule of Civil Procedure 23(a)(3):   Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.

180.   <u>Adequacy</u>.   Federal Rule of Civil Procedure 23(a)(4):   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.   The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

181.   <u>Declaratory and Injunctive Relief</u>.   Federal Rule of Civil Procedure 23(b)(2):   FCA has acted or refused to act on grounds generally applicable to

Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

182.   <u>Superiority</u>.   Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.   The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class to individually seek redress for FCA's wrongful conduct.   Even if Class members could afford individual litigation, the court system could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   VIOLATIONS ALLEGED

### A.   Claims Brought on Behalf of the Nationwide Class

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
#### (15 U.S.C. § 2301, *ET SEQ.*)

183.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

184.   This claim is brought on behalf of the Nationwide Class.

185.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

186.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

187.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

188.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

189.   FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

190.   FCA breached these warranties, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective Defective

Shifter that puts vehicle occupants' safety in jeopardy.  The Class Vehicles share a common design defect in that the Defective Shifter is defectively designed and unsafe, contrary to FCA's representations about its vehicles.  The Class Vehicles share a common design defect which can allow the car to roll away from its parked position.

191.   Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either FCA or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiffs and each of the other Nationwide Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

192.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  Indeed, FCA has already attempted to do so through an ineffective recall campaign.  However, the recall has failed to cure the defect.

193.   At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

194.   Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.  Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class members have not re-accepted their Class Vehicles by retaining them.

195.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

196.   Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## B.   Claims Brought on Behalf of the Arizona Subclass

### COUNT II

### VIOLATION OF CONSUMER FRAUD ACT
### (ARIZ. REV. STAT. § 44-1521, ET SEQ.)

197.   Plaintiff Wisam Yacoub ("Plaintiff," for purposes of all Arizona Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

198.   Plaintiff brings this Count on behalf of the Arizona Subclass.

199.   FCA, Plaintiff, and the Arizona Subclass are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

200.   The Class Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

201.   The Arizona CFA proscribes "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether

110

or not any person has in fact been misled, deceived or damaged thereby." ARIZ. REV. STAT. § 44-1522(A).

202.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

203.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

204.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

205.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable,

and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Arizona CFA.

206.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

207.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Arizona Subclass.

208.   FCA knew or should have known that its conduct violated the Arizona CFA.

209.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

210.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

<div style="margin-left:2em">

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was

</div>

manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

211. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

212.  FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Arizona Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

213.  Plaintiff and the Arizona Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose

material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Arizona CFA.

214.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Arizona CFA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

215.   FCA's violations present a continuing risk to Plaintiff as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

216.   The recalls and modifications instituted by FCA have not been adequate.

217.   As a direct and proximate result of FCA's violations of the Arizona CFA, Plaintiff and the Arizona Subclass have suffered injury-in-fact and/or actual damage.

218.   Plaintiff and the Arizona Subclass seek monetary relief against FCA in an amount to be determined at trial.  Plaintiff and the Arizona Subclass also seek punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind.

219.   Plaintiff also seeks an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON ARIZONA LAW)

220.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

221.   Plaintiff brings this Count on behalf of the Arizona Subclass.

222.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

223.   FCA further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

224.   FCA knew at the time it actively concealed this information that this information was material.

225. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

226. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

227. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

228. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

229. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

230.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.   Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT IV

### VIOLATION OF EXPRESS WARRANTY
### (ARIZ. REV. STAT. § 47-2313, *ET SEQ.*)

231.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

232.   Plaintiff brings this Count on behalf of themselves and the Arizona Subclass.

233.   FCA is and was at all relevant times a merchant with respect to motor vehicles under ARIZ. REV. STAT. § 47-2104(A).

234.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

235.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

236.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

237.   Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

238.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

239.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

240.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

241.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

242.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

243.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

244.   Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in ARIZ. REV. STAT. § 47-2711, the revocation of acceptance of the goods,

and the return to Plaintiff and the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under ARIZ. REV. STAT. §§ 47-2711 and 47-2608.

245.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

246.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT V

### VIOLATION OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ARIZ. REV. STAT. § 47-2314)

247.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

248.   Plaintiff brings this Count on behalf of themselves and the Arizona Subclass.

249.   FCA is and was at all relevant times a merchant with respect to motor vehicles under ARIZ. REV. STAT. § 47-2104(A).

250.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the

ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

251.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

252.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

<div align="center">

**COUNT VI**

**UNJUST ENRICHMENT**
**(BASED ON ARIZONA LAW)**

</div>

253.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

254.   Plaintiff brings this Count on behalf of themselves and the Arizona Subclass.

255.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

256.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective

Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

257.   Thus, all Arizona Subclass members conferred a benefit on FCA.

258.   It is inequitable for FCA to retain these benefits.

259.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

260.   FCA knowingly accepted the benefits of its unjust conduct.

261.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

C.     **Claims Brought on Behalf of the Colorado Subclass**

**COUNT VII**

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(COLO. REV. STAT. §§ 6-1-101, *ET SEQ.*)**

262.   Plaintiff Debra Felker ("Plaintiff," for purposes of all Colorado Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

263.   Plaintiff brings this Count on behalf of the Colorado Subclass.

264.   Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of

goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods."  Colo. Rev. Stat. § 6-1-105(1)(b), (e).

265.   FCA is a "person" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

266.   In the course of FCA's business, it failed to disclose, and actively concealed, the dangerous risk of faulty and defective Defective Shifters in Class Vehicles as described above.  Accordingly, FCA engaged in conduct likely to deceive.

267.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

268.   FCA's conduct proximately caused injuries to Plaintiff and the other Class members.

269.   Plaintiff and the other Class members were injured as a result of FCA's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's omissions.

## COUNT VIII

## STRICT PRODUCT LIABILITY
### (BASED ON COLORADO LAW)

270.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

271.   Plaintiff brings this Count on behalf of the Colorado Subclass.

272.   Colorado law recognizes an action for product defects that complements Colorado's Product Liability Statute, Colo. Rev. Stat. Title 13, Article 21, Part 4.

273.   FCA is a "manufacturer" and "seller" of the Class Vehicles within the meaning of Colo. Rev. Stat. § 13-21-401(1).

274.   FCA manufactured and sold the Class Vehicles in a defective condition and in a condition that was unreasonably dangerous to drivers, other motorists, pedestrians, and others or to their property, including persons who may reasonably be expected to use, consume, or be affected by them, in at least the following respects:  (i) the Class Vehicles were defectively designed, assembled, fabricated, produced, and constructed in that they contain faulty and defective Defective Shifters which can allow the car to roll away from its parked position; and (ii) the Class Vehicles were not accompanied by adequate warnings about their defective nature.

124

275.   The Class Vehicles were defective and unreasonably dangerous at the time they were sold by FCA and were intended to and did reach Plaintiff and the other Class Members in substantially the same condition as they were in when they were manufactured, sold, and left the control of FCA.

276.   Plaintiff and the other Class members are persons who were reasonably expected to use, consume, or be affected by the Class Vehicles.

277.   As a direct and proximate result of the defective and unreasonably dangerous conditions of the Class Vehicles, Plaintiff and the other Class members have suffered damages.

## COUNT IX

### FRAUDULENT CONCEALMENT
### (BASED ON COLORADO LAW)

278.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

279.   Plaintiff brings this Count on behalf of the Colorado Subclass.

280.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

281.   FCA further omitted from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car,

that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

282.   FCA knew at the time it actively concealed this information that this information was material.

283.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

284.   FCA had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that the Defective Shifter can allow the car to roll away from its parked position, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

285.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

286.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  FCA knew or recklessly disregarded that its representations were

false because it knew that people had experienced roll-away incidents. FCA intentionally made the false statements in order to sell Class Vehicles.

287. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

288. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

289. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT X

### BREACH OF EXPRESS WARRANTY
### (COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-210)

290. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

291. Plaintiff brings this Count on behalf of the Colorado Subclass.

292.  FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3); and is a "seller" of motor vehicles under Colo. Rev. Stat. § 4-2-103(1)(d).

293.  With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

294.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. § 4-2.5-103(1)(p).

295.  In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

296.  As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

297.  FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

128

298.   Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

299.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

300.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

301.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

302.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

303.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

304.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

305.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

306.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

# COUNT XI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (COLO. REV. STAT.  §§ 4-2-313 AND 4-2.5-212)

307.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

308.   Plaintiff brings this Count on behalf of the Colorado Subclass.

309.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3); and  is a "seller" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(d).

310.   With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

311.   The Class Vehicles are and were at all relevant times "goods" within the meaning Colo. Rev. Stat. § 4-2-105(1) and 4-2.5-103(1)(h).

312.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

313.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely

monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

314.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XII

### UNJUST ENRICHMENT
### (BASED ON COLORADO LAW)

315.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

316.   Plaintiff brings this Count on behalf of the Colorado Subclass.

317.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

318.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

319.   Thus, all Colorado Subclass members conferred a benefit on FCA.

320.   It is inequitable for FCA to retain these benefits.

321.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

322.   FCA knowingly accepted the benefits of its unjust conduct.

323.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### D.   Claims Brought on Behalf of the Georgia Subclass

### COUNT XIII

### VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390, *ET SEQ.*)

324.   Plaintiff Erica Willis ("Plaintiff," for purposes of all Georgia Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

325.   Plaintiff brings this Count on behalf of the Georgia Subclass.

326.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

327.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and

otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

328.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

329.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

330.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Georgia FBPA.

331.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

332.  FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Georgia Subclass.

333.  FCA knew or should have known that its conduct violated the Georgia FBPA.

334.  As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

335.  FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

   a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

   b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

336.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

337.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Georgia Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

338.   Plaintiff and the Georgia Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Georgia FBPA.

339.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Georgia FBPA.   All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

340.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

341.   As a direct and proximate result of FCA's violations of the Georgia FBPA, Plaintiffs and the Georgia Subclass have suffered injury-in-fact and/or actual damage.

342.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

343.   Plaintiff and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann § 10-1-399(a).

344.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann § 10-1-399.

345.   On July 8, 2016, certain Plaintiffs sent a letter complying with Ga. Code. Ann § 10-1-399(b).  Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Georgia Class are entitled.

## COUNT XIV
### VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (GA. CODE ANN. § 10-1-370, *ET SEQ.*)

346.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

347.   Plaintiff brings this Count on behalf of the Georgia Subclass.

348.   FCA, Plaintiff, and the Georgia Subclass are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann § 10-1-371(5).

349.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  Ga. Code. Ann § 10-1-372(a).

350.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

351.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

352.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

353.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that

valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Georgia UDTPA.

354.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

355.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Georgia Subclass.

356.   FCA knew or should have known that its conduct violated the Georgia UDTPA.

357.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

358.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the

United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.  Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.  Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

359. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

360. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Georgia Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

361. Plaintiff and the Georgia Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either

would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Georgia UDTPA.

362.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Georgia UDTPA.   All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

363.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

364.   As a direct and proximate result of FCA's violations of the Georgia UDTPA, Plaintiffs and the Georgia Subclass have suffered injury-in-fact and/or actual damage.

365.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

366.   Plaintiffs seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

## COUNT XV

## FRAUD BY CONCEALMENT
## (BASED ON GEORGIA LAW)

367.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

368.   This claim is brought on behalf of the Georgia Subclass.

369.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

370.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

371.   FCA knew at the time it actively concealed this information that this information was material.

372. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

373. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

374. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

375. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

376. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

377.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT XVI

### BREACH OF EXPRESS WARRANTY
### (GA. CODE ANN. § 11-2-313)

378.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

379.   Plaintiff brings this Count on behalf of the Georgia Subclass.

380.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

381.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

382.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

383.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

384.   Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

385.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

386.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

387.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

388.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

389.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

390.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

391.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

392.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XVII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (GA. CODE ANN. § 11-2-314)

393.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

394.   Plaintiff brings this Count on behalf of the Georgia Subclass.

395.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

396.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

397.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

398.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XVIII

### UNJUST ENRICHMENT
### (BASED ON GEORGIA LAW)

399.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

400.   Plaintiff brings this Count on behalf of the Georgia Subclass.

401.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

402.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

403.   Thus, all Georgia Subclass members conferred a benefit on FCA.

404.   It is inequitable for FCA to retain these benefits.

405.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

406.   FCA knowingly accepted the benefits of its unjust conduct.

407.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### E.   Claims Brought on Behalf of the Iowa Subclass

### COUNT XIX

### VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### (IOWA CODE § 714H.1, *ET SEQ.*)

408.   Plaintiff Pamela Havnen ("Plaintiff," for purposes of all Iowa Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

409.   Plaintiff brings this Count on behalf of the Iowa Subclass.

410.   Defendant is a "person" under Iowa Code § 714H.2(7).

411.   Plaintiff and the Iowa Subclass are "consumers" as that term is defined by Iowa Code § 714H.2(3), who purchased or leased one or more Class Vehicles.

412.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud false pretense, false promise, misrepresentation, concealment, suppression, or omission in

connection with the advertisement, sale or lease of consumer merchandise."  Iowa

Code § 714H.3.

413.   FCA participated in misleading, false, or deceptive practices that

violated the Iowa CFA.  By failing to disclose and actively concealing that the

Defective Shifter was not safe, by marketing its Class Vehicles as safe and of high

quality, and by presenting itself as a reputable manufacturer that valued safety and

stood behind its vehicles after they were sold, FCA engaged in deceptive business

practices prohibited by the Iowa CFA.

414.   In the course of its business, FCA willfully failed to disclose and

actively concealed the defectively designed Defective Shifter discussed herein and

otherwise engaged in activities with a tendency or capacity to deceive.  FCA also

engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression, or omission of

any material fact with intent that others rely upon such concealment, suppression,

or omission, in connection with the sale of the Class Vehicles.

415.   FCA has known that the Defective Shifter was defectively designed

and was not safe for at least two years, but concealed all of that information.

416.   FCA was also aware that it valued profits over safety, and that it was

manufacturing, selling, and distributing vehicles throughout the United States that

did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

417. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in unfair and deceptive business practices in violation of the Illinois CFA.

418. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

419. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

420.  FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Iowa Subclass.

421.  FCA knew or should have known that its conduct violated the Iowa CFA.

422.  As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

423.  FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.  Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.  Intentionally concealed the foregoing from Plaintiffs and the Class; and/or
>
> c.  Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

424.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

425.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Iowa Subclass.   A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

426.   Plaintiff and the Iowa Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Iowa CFA.

427.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Iowa CFA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

428.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

429.   As a direct and proximate result of FCA's violations of the Iowa CFA, Plaintiff and the Iowa Subclass have suffered injury-in-fact and/or actual damage.

430.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

431.   Pursuant to Iowa Code § 714H.5, Plaintiff and the Iowa Subclass seek an order enjoining FCA's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of FCA's willful and wanton disregard for the rights and safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

## COUNT XX

## FRAUDULENT CONCEALMENT
## (BASED ON IOWA LAW)

432.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

433.   This claim is brought on behalf of the Iowa Subclass.

434.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

435.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

436.   FCA knew at the time it actively concealed this information that this information was material.

437.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

438.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance

at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

439.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

440.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

441.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

442.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT XXI

### BREACH OF EXPRESS WARRANTY
### (IOWA CODE § 554.2313 AND 554.13210)

443.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

444.   Plaintiff brings this Count on behalf of the Iowa Subclass.

445.   FCA is and was at all relevant times a merchant with respect to motor vehicles under Iowa Code § 554.2104.

446.   With respect to leases, FCA is and was at all relevant times a "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

447.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship."  FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

448.   FCA's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with a defective Defective Shifter from FCA.

158

449.   FCA breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by FCA.  FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

450.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

451.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

452.   Also, as alleged in more detail herein, at the time that FCA warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to FCA's Limited Warranty and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

453. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

454. Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Iowa Code § 554.2608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other Class members of the purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under Iowa Code §§ 554.2711 and 554.2608.

455. FCA was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and the other Class members before or within a reasonable amount of time after FCA issued the recall and the allegations of Class Vehicle defects became public.

456.   As a direct and proximate result of FCA's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XXII

## UNJUST ENRICHMENT
## (BASED ON IOWA LAW)

457.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

458.   Plaintiff brings this Count on behalf of the Iowa Subclass.

459.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

460.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

461.   Thus, all Iowa Subclass members conferred a benefit on FCA.

462.   It is inequitable for FCA to retain these benefits.

463.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

464.   FCA knowingly accepted the benefits of its unjust conduct.

465.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## F.   Claims Brought on Behalf of the Louisiana Subclass

### COUNT XXIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524)

466.   Plaintiff Dustin Stewart ("Plaintiff," for purposes of all Louisiana Subclass Counts) incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

467.   Plaintiff brings this Count on behalf of the Louisiana Subclass.

468.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

469.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

470.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely

monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

471.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

### G.   Claims Brought on Behalf of the Maryland Subclass
### COUNT XXIV
### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE COM. LAW § 13-101, *ET SEQ.*)

472.   Plaintiffs Bruce Pollekoff and Charles Frank Schultz ("Plaintiffs," for purposes of all Maryland Subclass Counts) incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

473.   Plaintiffs bring this Count on behalf of the Maryland Subclass.

474.   FCA, Plaintiffs, and the Maryland Subclass are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

475.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.   MD. COM. LAW CODE § 13-303.   FCA participated in misleading, false, or deceptive acts that violated the Maryland CPA.

476.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and

163

otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

477. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

478. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

479. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Maryland CPA.

480.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

481.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Maryland Subclass.

482.   FCA knew or should have known that its conduct violated the Maryland CPA.

483.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

484.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

   c. Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

485. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

486. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Maryland Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

487. Plaintiffs and the Maryland Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Maryland CPA.

488.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Maryland CPA.   All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

489.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

490.   As a direct and proximate result of FCA's violations of the Maryland CPA, Plaintiffs and the Maryland Subclass have suffered injury-in-fact and/or actual damage.

491.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

492.   Pursuant to MD. CODE COM. LAW § 13-408, Plaintiff and the Maryland Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT XXV

## FRAUDULENT CONCEALMENT
## (BASED ON MARYLAND LAW)

493.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

494.  This claim is brought on behalf of the Maryland Subclass.

495.  FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

496.  FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

497.  FCA knew at the time it actively concealed this information that this information was material.

498.  The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

499.  FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance

168

at FCA, because Plaintiffs and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

500.   The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

501.   Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

502.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

503.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members.  Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## COUNT XXVI

## BREACH OF EXPRESS WARRANTY
### (MD. CODE COM. LAW §2-313)

504.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

505.  Plaintiffs bring this Count on behalf of the Maryland Subclass.

506.  In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year reduced, its powertrain warranty to five years or 60,000 miles).

507.  As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

508.  FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

509.  Plaintiffs and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform

Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

510.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

511.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

512.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

513.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

514.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently

171

concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

515.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

516.  Finally, due to FCA's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for a return to Plaintiffs and the other Class members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

517.  FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

518.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XXVII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(MD. CODE COM. LAW § 2-314)

519.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

520.   Plaintiffs bring this Count on behalf of the Maryland Subclass.

521.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

522.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

523.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

524.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XXVIII

### UNJUST ENRICHMENT
### (BASED ON MARYLAND LAW)

525.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

526.   Plaintiffs bring this Count on behalf of the Maryland Subclass

527.   FCA has received and retained a benefit from Plaintiffs and inequity has resulted.

528.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

529.   Thus, all Maryland Subclass members conferred a benefit on FCA.

530.   It is inequitable for FCA to retain these benefits.

531.   Plaintiffs and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

532.   FCA knowingly accepted the benefits of its unjust conduct.

533.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### H.   Claims Brought on Behalf of the Minnesota Subclass

### COUNT XXIX

### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (MINN. STAT. § 325F.68, *ET SEQ.*)

534.   Plaintiff Corinn Berken ("Plaintiff," for purposes of all Minnesota Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

535.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

536.   The Affected Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

537.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ."  MINN. STAT. § 325F.69(1).

538.   FCA's actions as set forth herein occurred in the conduct of trade or commerce.

175

539.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

540.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

541.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  FCA concealed this information as well.

542.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that

valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Minnesota CFA.

543.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

544.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Minnesota Subclass.

545.   FCA knew or should have known that its conduct violated the Minnesota CFA.

546.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

547.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the

United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

548.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

549.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Minnesota Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

550.   Plaintiff and the Minnesota Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either

would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Minnesota CFA.

551.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Minnesota CFA.   All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

552.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

553.   As a direct and proximate result of FCA's violations of the Minnesota CFA, Plaintiffs and the Minnesota Subclass have suffered injury-in-fact and/or actual damage.

554.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

179

555. Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

556. Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights or safety of others.

## COUNT XXX

### VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48, *ET SEQ.*)

557. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

558. Plaintiff brings this Count on behalf of the Minnesota Subclass.

559. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

560.   FCA's actions as set forth herein occurred in the conduct of trade or commerce.

561.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

562.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

563.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

564.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable,

181

and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Minnesota CFA.

565.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

566.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Minnesota Subclass.

567.   FCA knew or should have known that its conduct violated the Minnesota DTPA.

568.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

569.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was

manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

570.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

571.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Minnesota Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

572.   Plaintiff and the Minnesota Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose

material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Minnesota DTPA.

573.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Minnesota DTPA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

574.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

575.   As a direct and proximate result of FCA's violations of the Minnesota DTPA, Plaintiffs and the Minnesota Subclass have suffered injury-in-fact and/or actual damage

576.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

577. Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

578. Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that FCA's acts show deliberate disregard for the rights or safety of others.

## COUNT XXXI

## FRAUDULENT CONCEALMENT
## (BASED ON MINNESOTA LAW)

579. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

580. Plaintiff brings this Count on behalf of the Minnesota Subclass.

581. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

582. FCA further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

583.   FCA knew at the time it actively concealed this information that this information was material.

584.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

585.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

586.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

587.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

588.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to,

their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

589.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages,

## COUNT XXXII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MINN. STAT. § 336.2-314)

590.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

591.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

592.   FCA was a merchant with respect to motor vehicles within the meaning of Minn. Stat. § 336.2-104(1).

593.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under Minn. Stat § 336.2A-103(1)(p) and § 336.2A-210.

594.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

595.   Under Minn. Stat. § 336.2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when

187

Plaintiffs purchased or leased their Affected Vehicles. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

596.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

597.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XXXIII

### BREACH OF EXPRESS WARRANTY
### (MINN. STAT. § 336.2-313, AND § 336.2A-210)

598.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

599.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

600.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat § 336.2-104(1) and a "seller" of motor vehicles under § 336.2-313(1)

601.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under Minn. Stat § 336.2A-103(1)(p) and § 336.2A-210.

602.   The Affected Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105 and Minn. Stat § 336.2A-103(1)(h)

603.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

604.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

605.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

606.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

607.   Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

608.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

609.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

610.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

611.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

612.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

613.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

614.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

615.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XXXIV

## UNJUST ENRICHMENT
## (BASED ON MINNESOTA LAW)

616.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

617.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

618.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

619.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

620.   Thus, all Minnesota Subclass members conferred a benefit on FCA.

621.   It is inequitable for FCA to retain these benefits.

622.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

623.   FCA knowingly accepted the benefits of its unjust conduct.

624.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## I.      Claims Brought on Behalf of the North Carolina Subclass

## COUNT XXXV

## VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.*)

625.   Plaintiff Brittani Sheppard ("Plaintiff," for purposes of all North Carolina Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

626.   Plaintiff brings this Count on behalf of the North Carolina Subclass.

627.   North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. §§ 75-1.1, et seq. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. GEN. STAT. § 75-16.

628.   FCA's acts and practices complained of herein were performed in the course of FCA's trade or business and thus occurred in or affected "commerce," as defined in N.C. GEN. STAT. § 75-1.1(b).

629.   In the course of its business, FCA willfully failed to disclose and actively concealed that the defective Defective Shifter discussed herein was unsafe and otherwise engaged in activities with a tendency or capacity to deceive.

Accordingly, FCA engaged in unfair and deceptive trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

630.   FCA's conduct proximately caused injuries to Plaintiff and the other Class members.

631.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

632.   FCA acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

633.   Plaintiff and the other Class members were injured as a result of FCA's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class

Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

634.   Plaintiff, individually and on behalf of the other Class members, seek treble damages pursuant to N.C. GEN. STAT. § 75-16, and an award of attorneys' fees pursuant to N.C. GEN. STAT. § 75-16.1.

## COUNT XXXVI

### FRAUDULENT CONCEALMENT
### (BASED ON NORTH CAROLINA LAW)

635.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

636.   Plaintiff brings this Count on behalf of the North Carolina Subclass.

637.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

638.   FCA further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had a design defect which can allow the car to roll away from its parked position, and would not perform and operate properly when driven in normal usage.

639. FCA knew at the time it actively concealed this information that this information was material.

640. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

641. FCA had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that that the Class Vehicles had a design defect which can allow the car to roll away from its parked position, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

642. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

643. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. FCA knew or recklessly disregarded that its representations were false because it knew that the Defective Shifter installed in the Class Vehicles is defective and exposes drivers, occupants and members of the public to safety risks. FCA intentionally made the false statements in order to sell Class Vehicles.

644.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifter – in purchasing or leasing FCA's Class Vehicles.

645.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

646.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

<div align="center">

**COUNT XXXVII**

**BREACH OF EXPRESS WARRANTY**
**(N.C. GEN. STAT. § 25-2-313 AND § 25-2A-210)**

</div>

647.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

648.   Plaintiff brings this Count on behalf of the North Carolina Subclass.

649.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. GEN. STAT. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-313(1).

650.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under N.C. GEN. STAT. § 25-2A-103(1)(p) and § 25-2A-210.

651.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. GEN. STAT. § 25-2-105(1) and N.C. GEN. STAT. § 25-2A-103(1)(h).

652.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

653.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

654.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

655.   Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

656.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

657.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

658.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

659.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

660.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

661.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

662.   Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, the return to Plaintiff and the other Class members of the purchase price of all Class Vehicles currently owned, and such other incidental and consequential damages as allowed.

200

663.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

664.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XXXVIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. GEN. STAT.  § 25-2-314)

665.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

666.   Plaintiff brings this Count on behalf of the North Carolina Subclass.

667.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

668.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

669.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

670.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XXXIX

## UNJUST ENRICHMENT
## (BASED ON NORTH CAROLINA LAW)

671.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

672.   Plaintiff brings this Count on behalf of the North Carolina Subclass.

673.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

674.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

675.   Thus, all North Carolina Subclass members conferred a benefit on FCA.

676.   It is inequitable for FCA to retain these benefits.

677.   Plaintiff and the Class were not aware of the true facts about the Class

Vehicles, and did not benefit from FCA's conduct.

678.   FCA knowingly accepted the benefits of its unjust conduct.

679.   As a result of FCA's conduct, the amount of its unjust enrichment

should be disgorged, in an amount according to proof.

**J.   Claims Brought on Behalf of the Oklahoma Subclass**

**OKLAHOMA COUNT XL**

**VIOLATIONS OF OKLAHOMA CONSUMER PROTECTION ACT**
**(OKLA. STAT. TIT. 15 § 751, *ET SEQ.*)**

680.   Plaintiff Carol Clark ("Plaintiff," for purposes of all Oklahoma

Subclass Counts) incorporates by reference all preceding allegations as though

fully set forth herein.

681.   Plaintiff brings this Count on behalf of the Oklahoma Subclass.

682.   The Oklahoma Consumer Protection Act ("Oklahoma CPA")

prohibits, in the course of business: "mak[ing] a false or misleading representation,

knowingly or with reason to know, as to the characteristics …, uses, [or] benefits,

of the subject of a consumer transaction," or making a false representation,

"knowingly or with reason to know, that the subject of a consumer transaction is of

a particular standard, style or model, if it is of another or "[a]dvertis[ing],

knowingly or with reason to know, the subject of a consumer transaction with

203

intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit. 15 § 753.

683.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

684.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

685.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

686.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable,

and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Oklahoma CPA.

687.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

688.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Oklahoma Subclass.

689.   FCA knew or should have known that its conduct violated the Oklahoma CPA.

690.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

691.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

        a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was

manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

692.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

693.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Oklahoma Subclass.   A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

694.   Plaintiff and the Oklahoma Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose

material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Oklahoma CPA.

695.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Oklahoma CPA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

696.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

697.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Oklahoma Class members, about safety and reliability of the Deceptive Shifter Vehicles, the quality of the FCA brand, the devaluing of integrity at FCA, and the true value of the Class Vehicles.

698.   Plaintiff and Oklahoma Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the Oklahoma Class members who purchased or leased the Class Vehicles would not

have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

699.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

700.   Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of its business.

701.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

702.   Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiffs and the Oklahoma Class seek an order enjoining FCA's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA.

## COUNT XLI

## FRAUDULENT CONCEALMENT
## (BASED ON OKLAHOMA LAW)

703.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

704.   Plaintiff brings this Count on behalf of the Oklahoma Subclass.

705.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

706.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

707.   FCA knew at the time it actively concealed this information that this information was material.

708.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

709.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance

209

at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

710.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

711.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

712.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

713.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT XLII

### BREACH OF EXPRESS WARRANTY
### (OKLA. STAT. TIT. 12A §§ 2-313 AND 2A-210)

714.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

715.   Plaintiff brings this Count on behalf of the Oklahoma Subclass.

716.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

717.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

718.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1), and 2A-103(1)(h).

719.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship."  FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

720.  As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

721.  FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

722.  Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

723.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

724.  Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

725.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

726.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

727.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

728.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

729.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

730.  As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XLIII

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(OKLA. STAT. TIT. 12A §§ 2-314 AND 2A-212)**

731.  Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

732.  Plaintiff brings this Count on behalf of the Oklahoma Subclass.

733.  FCA is and was at all relevant times a merchant with respect to motor vehicles.

734.  A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

735.  FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

736.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XLIV

### UNJUST ENRICHMENT
### (BASED ON OKLAHOMA LAW)

737.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

738.   Plaintiff brings this Count on behalf of the Oklahoma Subclass.

739.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

740.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

741.   Thus, all Oklahoma Subclass members conferred a benefit on FCA.

742.   It is inequitable for FCA to retain these benefits.

743.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

744.   FCA knowingly accepted the benefits of its unjust conduct.

745.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### K.     Claims Brought on Behalf of the Texas Subclass
### COUNT XLV

### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT
### (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)

746.   Plaintiffs Cris-Ann Craig, Kelli Foreman, Krystal Dial, Ashley Gillipsie, and Jay Waggoner ("Plaintiffs," for purposes of all Texas Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

747.   Plaintiffs bring this Count on behalf of the Texas Subclass.

748.   Plaintiffs and the Texas Subclass are individuals, partnerships or corporations with assets of less than $25 million (or are controller by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

749.   FCA is a "person" within the meaning of TEX. BUS. & COM. CODE § 17.45(3).

750.   FCA's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TEX. BUS. & COM. CODE § 17.46(A).

751.   The Texas Deceptive Trade Practices Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," TEX. BUS. & COM. CODE § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE §§ 17.45(5) and 17.50(a)(3).

752.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

753.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

754.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

755.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Texas DTPA.

756.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

757.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Texas Subclass.

758.   FCA knew or should have known that its conduct violated the Texas DTPA.

759.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

760.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or
>
> c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

761.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

762.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Texas Subclass.   A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

763.   Plaintiffs and the Texas Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.   Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Texas DTPA.

764.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Texas DTPA.   All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

765.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

766.   As a direct and proximate result of FCA's violations of the Texas DTPA, Plaintiffs and the Texas Subclass have suffered injury-in-fact and/or actual damage.

767.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

768.   Pursuant to TEX. BUS. & COM. CODE § 17.50, Plaintiffs and the Texas Subclass seek monetary relief against FCA measured as actual damages in an amount to be determined at trial, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

769.   On July 8, 2016, certain Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE § 17.505(a).  Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Texas Subclass are entitled.

## COUNT XLVI

## FRAUDULENT CONCEALMENT
## (BASED ON TEXAS LAW)

770.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

771.   Plaintiffs bring this Count on behalf of the Texas Subclass.

772.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

773.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

774.   FCA knew at the time it actively concealed this information that this information was material.

775.   The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

776.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material

representations that the Class Vehicles they were purchasing were safe and free from defects.

777.   The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

778.   Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

779.   As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

780.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members.  Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

**COUNT XLVII**
**BREACH OF EXPRESS WARRANTY**
**(TEX. BUS. & COM. CODE § 2.313)**

781.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

782.   Plaintiffs bring this Count on behalf of the Texas Subclass.

783.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104(a) and a "seller" of motor vehicles under § 2.313(a).

784.   The Class Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE § 2.105(a) and § 2.313.

785.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

786.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Class Vehicles.

787.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defective Defective Shifter system from FCA.

788.   Plaintiffs and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defective Defective Shifter free of charge.

789.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

790.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

791.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

792.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

793.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

794.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

795.   FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

796.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT XLVIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (TEX. BUS. & COM. CODE § 2.314)

797. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

798. Plaintiffs bring this Count on behalf of the Texas Subclass.

799. FCA is and was at all relevant times a merchant with respect to motor vehicles.

800. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

801. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

802. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XLIX

## UNJUST ENRICHMENT
## (BASED ON TEXAS LAW)

803.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

804.   Plaintiffs bring this Count on behalf of the Texas Subclass.

805.   FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

806.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

807.   Thus, all Texas Subclass members conferred a benefit on FCA.

808.   It is inequitable for FCA to retain these benefits.

809.   Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

810.   FCA knowingly accepted the benefits of its unjust conduct.

811.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**L.**     **Claims Brought on Behalf of the Utah Subclass**

**COUNT L**

**VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT**
**(UTAH CODE ANN. § 13-11-1, *ET SEQ.*)**

812.   Plaintiff Trevor Marble ("Plaintiff," for purposes of all Utah Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

813.   Plaintiff brings this Count on behalf of the Utah Subclass.

814.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4.  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  UTAH CODE ANN. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE ANN. § 13-11-5.

815.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also

engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

816. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

817. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

818. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Utah CSPA.

819. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class

members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

820.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Utah Subclass.

821.   FCA knew or should have known that its conduct violated the Utah CSPA.

822.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

823.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or
>
> c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

824.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

825.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Utah Subclass.   A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

826.   Plaintiff and the Utah Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Utah CSPA.

827.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Utah CSPA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a

result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

828.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

829.   As a direct and proximate result of FCA's violations of the Utah CSPA, Plaintiffs and the Utah Subclass have suffered injury-in-fact and/or actual damage.

830.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

831.   Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs and the Utah Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff and each Utah Class member, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

## COUNT LI

## FRAUDULENT CONCEALMENT
## (BASED ON UTAH LAW)

832. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

833. Plaintiff brings this Count on behalf of the Utah Subclass.

834. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

835. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

836. FCA knew at the time it actively concealed this information that this information was material.

837. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

838. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance

at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

839. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

840. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

841. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

842. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT LII

### BREACH OF EXPRESS WARRANTY
### (UTAH CODE §§ 70A-2-313 AND 70A-2A-210)

843.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

844.   Plaintiffs bring this Count on behalf of the Utah Subclass.

845.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

846.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

847.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

848.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

236

849.   Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

850.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

851.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

852.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

853.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

854.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

855.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

856.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

857.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT LIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (UTAH CODE §§ 70A-2-314 AND 70A-2A-212)

858.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

859.   Plaintiff brings this Count on behalf of the Utah Subclass.

860.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

861.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

862.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

863.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

239

## COUNT LIV

## UNJUST ENRICHMENT
## (BASED ON UTAH LAW)

864.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

865.   Plaintiff brings this claim on behalf of the Utah Subclass.

866.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

867.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

868.   Thus, all Utah Subclass members conferred a benefit on FCA.

869.   It is inequitable for FCA to retain these benefits.

870.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

871.   FCA knowingly accepted the benefits of its unjust conduct.

872.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**M.** **Claims Brought on Behalf of the Wyoming Subclass**

**COUNT LV**

**VIOLATIONS OF THE WYOMING CONSUMER PROTECTION ACT**
**(WYO. STAT. §§ 40-12-101, *ET SEQ.*)**

873. Plaintiff Ann Magnuson ("Plaintiff," for purposes of all Wyoming Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

874. This claim is brought only on behalf of the Wyoming Subclass.

875. Plaintiff, the Wyoming Subclass and FCA are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

876. The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

877. Each sale or lease of a Class Vehicle to a Plaintiff or Wyoming Subclass member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These consumer transactions occurred "in the course of [FCA's] business" under Wyo. Stat. § 40-12-105(a). Plaintiff and Wyoming Subclass members purchased or leased one or more Class Vehicle.

878. The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits lists unlawful deceptive trade practices, including when a seller: "(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents that merchandise is of a particular standard,

241

grade, style or model, if it is not;" "(x) Advertises merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or practices." Wyo. Stat. §§ 40-12-105(a).

879.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

880.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

881.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

882.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Wyoming CPA.

883.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

884.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Wyoming Subclass.

885.   FCA knew or should have known that its conduct violated the Wyoming CPA.

886.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

887.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

      a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

      b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

      c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

888.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

889.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Wyoming Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

890.   Plaintiff and the Wyoming Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Wyoming CPA.

891.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Wyoming CPA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

892.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

893.   As a direct and proximate result of FCA's violations of the Wyoming CPA, Plaintiffs and the Wyoming Subclass have suffered injury-in-fact and/or actual damage.

894. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

245

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

895.   Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiff and the Wyoming Subclass seek damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

896.   On July 8, 2016, certain Plaintiffs sent a letter complying with Wyo. Stat. § 40-12-109.  Because FCA failed to offer to cure, or failed to complete a remedy of its deceptive trade acts and practices within the required time period, see Wyo. Stat. § 40-12-102(a)(ix), Plaintiffs seek all damages and relief available under the Wyoming CPA.

## COUNT LVI

## FRAUDULENT CONCEALMENT
## (BASED ON WYOMING LAW)

897.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

898.   This claim is brought on behalf of the Wyoming Subclass.

899.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied

246

Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

900. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

901. FCA knew at the time it actively concealed this information that this information was material.

902. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

903. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

904. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

905.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

906.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

907.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT LVII
## BREACH OF EXPRESS WARRANTY
### (WYO. STAT. § 34.1-2-313)

908.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

909.   This claim is brought on behalf of members of the Wyoming Subclass.

910.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

911.   With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

912.   The Affected Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

913.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

914.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

915.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

916.   Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform

Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

917.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

918.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

919.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

920.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

921.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently

concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

922.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

923.  FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

924.  As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT LVIII

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (WYO. STAT. §§ 34.1-2-314 AND 34.1-2.A-212)

925.  Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

926.   Plaintiff brings this Count on behalf of the Wisconsin Subclass.

927.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

928.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

929.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

930.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## COUNT LIX

### UNJUST ENRICHMENT
### (BASED ON WYOMING LAW)

931.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

932.   Plaintiff brings this Count on behalf of the Wyoming Subclass.

933.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

934.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

935.   Thus, all Wyoming Subclass members conferred a benefit on FCA.

936.   It is inequitable for FCA to retain these benefits.

937.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

938.   FCA knowingly accepted the benefits of its unjust conduct.

939.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.   Certification of the proposed Class, including appointment of Plaintiffs' Counsel as Class Counsel;

B.     An   order   temporarily   and   permanently   enjoining   FCA   from continuing   the   unlawful,   deceptive,   fraudulent,   and   unfair   business   practices alleged in this Complaint;

C.     Appropriate injunctive relief;

D.     Any and all equitable relief, including but not limited to, the buyback of the Class Vehicles;

E.     Costs, restitution, damages, including statutory and punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.     Any and all consequential damages, including, but not limited to, the time spent bringing the car in for repair;

G.     An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

H.     An award of costs and attorneys' fees; and

I.     Such other or further relief as may be appropriate.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: March 28, 2017                    Respectfully submitted,

*/s/ E. Powell Miller*

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Joseph H. Meltzer
Peter A. Muhic
Melissa Troutner
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
pmuhic@ktmc.com
mtroutner@ktmc.com

**HAGENS, BERMAN, SOBOL,
SHAPIRO, LLP**
Steve W. Berman
Thomas E. Loeser
Christopher R. Pitoun
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206-623-7292

255

steve@hbsslaw.com
toml@hbsslaw.com
christopherp@hbsslaw.com

**GUSTAFSON GULEK PLLC**
Daniel E. Gustafson
Jason S. Kilene
David A. Goodwin
Raina C. Borrelli
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
jkilene@gustafsongluek.com
dgoodwin@gustafsongluek.com
rborrelli@gustafsongluek.com

**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
Robert K. Shelquist
Rebecca A. Peterson
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone: 612-339-6900
rkshelquist@loclaw.com
rapeterson@locklaw.com

**GREG COLEMAN LAW PC**
Gregory F. Coleman
Lisa A. White
Mark E. Silvey
Adam E. Edwards
800 South Gay Street, Suite 1100
Knoxville, TN  37929
Telephone: 865-247-0080
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com
mark@gregcolemanlaw.com
adam@gregcolemanlaw.com

256

**MANTESE HONIGMAN PC**
David Honigman
Douglas Toering
Gerard V. Mantese
1361 East Big Beaver Road
Troy, MI  48083
Telephone: 248-457-9200
dhonigman@manteselaw.com
dtoering@manteselaw.com
gmantese@manteselaw.com

257